**CITY OF TUSCALOOSA; Municipal Utilities Board of Albertville; The Water Works and Sewer Board of the City of Birmingham; Water Works & Sewer Board of the City of Centre; The City of Dothan, a municipal corporation; The Water Works and Sewer Board of the City of Gadsden; The Utilities Board of the City of Gulf Shores; The City of Huntsville Water Works Utility Board; The Water Works Board of the City of Leeds; The Board of Water and Sewer Commissioners of the City of Mobile; The Board of Water & Sewer Commissioners of the City of Saraland; City of Sheffield; City of Vernon Water and Sewer Board; City of Phenix City; The City of Alexander City; The Water Works Board of the City of Arab; Baker Hill Water Authority; Calhoun County Water and Fire Protection Authority; Dallas County Water and Sewer Authority; Central Elmore Water Authority; City of Fairhope; Geneva Water Works and Sewer Board; The Water Works and Sewer Board of the City of Greenville; Town of Hayneville; Jefferson County, Alabama; The Utilities Board of the City of Muscle Shoals; North East Morgan County Water and Fire Protection Authority; Perdido Bay Water, Sewer, and Fire Protection District;** The Water Works, Sewer and Gas Board of the City of Scottsboro; Utilities Board of The Town of Citronelle d/b/a South Alabama Utilities; The Water and Sewer Board of the City of Talladega; Tri–Community Water System; The Waterworks and Sewer Board of the City of Pritchard; and The Waterworks and Sewer Board of the Town of Westover, **Plaintiffs,**

**Auburn Water Works Board; Jasper Water Works and Sewer Board, Inc.; Opelika Water Works Board; The Water Works and Sanitary Sewer Board for the City of Montgomery; and The Water Works and Sewer Board of the City of Selma, Plaintiff Intervenors,**

v.

**HARCROS CHEMICALS, INC.; Jones Chemicals, Inc.; Van Waters & Rogers, Inc.; PB & S Chemical Co., Inc.; and Industrial Chemicals, Inc., Defendants.**

Civ. A. No. 92–G–1614–S.

United States District Court,
N.D. Alabama,
Southern Division.

Feb. 22, 1995.

Thomas A. Carraway, Clarence M. Small, Jr., John C. Hall III, Rives & Peterson, L. Vastine Stabler, Jr., William H. Prior, Jr., Walston, Stabler, Wells, Anderson & Bains, Birmingham, AL, T. Dudley Perry, Perry & Perry, Montgomery, AL, for plaintiffs.

Stanley A. Cash, Huie, Fernambucq & Stewart, Birmingham, AL, David E. Everson, Stinson, Mag & Fizzell, Kansas City, MO, for defendant Harcros Chemicals.

James C. Barton, Sr., Robert S. Vance, Jr., Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, AL, Gordon L. Lang, Nixon, Hargrave, Devans & Doyle, Washington, DC, for defendant Jones Chemicals.

J. Mark White, White, Dunn & Booker, Birmingham, AL, Keith E. Rounsaville, Edward C. LaRose, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, FL, for defendant Van Waters & Rogers.

Andrew P. Campbell, Leitman, Siegal, Payne & Campbell, Birmingham, AL, C. David Deep, Deep & Womack, Henderson, KY, for defendant PB & S Chemical.

Thad G. Long, James S. Christie, Jr., Bradley, Arant, Rose & White, Birmingham, AL, for defendant Indus. Chemicals.

John M. Johnson, E. Glenn Waldrop, Jr., William S. Cox III, Wynn M. Shuford, Lightfoot, Franklin, White & Lucas, Birmingham, AL, for intervening plaintiffs.

## MEMORANDUM OPINION

GUIN, Senior District Judge.

Plaintiffs in the above-styled cause are public entities organized and located in Alabama that purchase repackaged chlorine for the treatment of drinking water, sewage, and swimming pools. Defendant chemical com-

panies either distribute or repackage chlorine[1] within the flow of interstate commerce.[2] The sale and distribution of chlorine between these buyers and sellers is handled by submission of sealed bids[3] or by negotiation of purchase prices with one or more suppliers.

Experts for opposing parties have characterized the chlorine industry as an oligopoly selling a homogeneous product to an inelastic market on an ongoing basis.

Plaintiffs allege that a relatively small group of firms engaged in a price-fixing conspiracy with respect to price in sealed bid auctions for municipal chlorine procurement in Alabama from 1984 to 1990. Most of the defendants are relatively large, publicly held, for-profit corporations. They repackage chlorine into one-ton and 150–pound cylinders for use in water treatment and other industrial applications. The defendants enjoy substantial nonmunicipal business. They buy raw chlorine at similar prices from a small group of upstream chemical manufacturers and face similar costs and inelastic demand. Rivalry between suppliers is continuous and ongoing, with the same group of firms, usually joined by "outsiders,"[4] facing each other repeatedly. All defendants issued price lists for use by their sales representatives during the relevant period. Most sales were made at the list prices. All firms were interested in the pricing strategies of their rivals. New competitors found low barriers to entry into the market area.

It is plaintiffs' contention that defendants implemented their pricing agreement by confining pricing to a few individuals. Joe Ragusa[5] was denominated as the Harcros Chemicals official to control pricing. Richard Perry[6] was the individual at PB & S Chemical Company. Robert and Jeff Jones controlled pricing at Jones Chemicals.[7] Darwin Simpson[8] was Van Waters & Rogers' named official.

Defendant Harcros Chemicals, Inc. [hereinafter Harcros],[9] is a chlorine repackager organized under the laws of Delaware with its principal place of business in Kansas. It has sold repackaged chlorine to industrial and municipal customers in Alabama since the 1960's.

Defendant Van Waters & Rogers, Inc. [hereinafter Van Waters][10] is a chlorine re-

1. Repackaged chlorine is liquid chlorine that has been pressurized and stored in either one-ton containers or 150–pound containers for use by chlorine consumers.

2. Chlorine is imported into Alabama for repackaging and distribution to public entities. Repackaged chlorine is exported to other states.

3. Typically those companies that required bids would send their specifications to the companies that had submitted bids in the past, request that bids be submitted by a certain date and time, and then publicly open the bids and announce what each competitor had bid. The effect of this public disclosure was to make known to all companies in the market what each company had bid.

4. Defendants Van Waters & Rogers, Inc. and PB & S Chemical Co., Inc. are arguably "outsiders" in the Alabama chlorine market. They do not have a chlorine repackaging plant or centrally-located warehouse in Alabama. They bid infrequently and sold to very few customers in Alabama during the alleged conspiracy period.

5. Harcros Vice–President Southeast Region.

6. Plaintiffs maintain Perry was solely responsible for chlorine pricing although his general job was quality control.

7. Robert Jones, deceased, was president of Jones. Jeff Jones is his son.

8. Eastern regional manager for McKesson/Van Waters. From 1982 through 1985, Mr. Simpson had chlorine pricing authority for Florida, Georgia, North and South Carolina, most of Virginia, the eastern two-thirds of Tennessee, and some central and northern parts of Alabama. From January through October of 1986 he had pricing authority from Maine to Miami and the southeast quadrant of the United States. In October 1986, his pricing authority over Louisiana, Arkansas, Memphis and Tennessee was cut back. About 1990 he regained these areas.

Mr. Simpson has stated that market conditions dictated chlorine price.

9. Formerly known as Thompson–Hayward Chemical Co. For purposes of this opinion both Thompson–Hayward Chemical Co. and Harcros will be referred to as Harcros.

10. Van Waters & Rogers is the successor by the 1986 acquisition of Moreland–McKesson Chemical Company. For purposes of this opinion both are referred to as Van Waters.

packager organized under the laws of the State of Washington with its principal place of business in Washington.

Defendant Industrial Chemicals, Inc. [hereinafter Industrial], a chlorine distributor for defendants Jones and PB & S, is organized under the laws of the State of Alabama with its principal place of business in Alabama.

Defendant Jones Chemicals, Inc. [hereinafter Jones] is a chlorine repackager organized under the laws of the State of New York with its principal place of business in New York.

Defendant PB & S Chemical Company, Inc. [hereinafter PB & S] is a chlorine repackager [11] organized under the laws of the State of Kentucky with its principal place of business in Kentucky.

■ Plaintiffs allege the defendants have conspired across state lines to violate federal and state antitrust laws to restrain trade in or affecting interstate commerce by fixing prices, allocating markets, and rigging bids for the sale of repackaged chlorine to public entities, including the plaintiffs, in the state of Alabama. 15 U.S.C. §§ 1, 2; 15 U.S.C. § 26; and Ala.Code § 6–5–60 (1993). The complaint contends that a horizontal arrangement to restrain trade existed among chlorine repackagers/distributors in Alabama during the 1980's for the purpose of establishing higher prices than would otherwise prevail.

Specific allegations follow:

1. The defendants violated section one of the Sherman Act by exchanging price information for the sale of repackaged chlorine to Alabama public entities; [12] allocating contracts or winning bids in geographic markets; refusing to deal with the plaintiffs; and submitting complementary, noncompetitive, or identical bids to public entities; and

2. The defendants fraudulently concealed their illegal conspiracy by submitting prearranged, complimentary losing bids for the supply of repackaged chlorine, giving the illusion of free market competition; [13] conducting secret activities in furtherance of the conspiracy; confining knowledge of the conspiracy to a small number of key officials of the defendants; and testifying falsely under oath about their bid rigging scheme during an investigation and prosecution of civil actions by the Attorney General of Florida.

In an effort to prove their case plaintiffs have outlined seven structural conditions that facilitated the conspiracy: 1) Presence of oligopoly makes price conspiracy easier to accomplish; 2) Product homogeneity simplifies a collusive price agreement; 3) Sealed bidding makes collusion more likely because a cheater cannot hide a price cut; 4) Inelastic demand for chlorine facilitates collusion; 5) Static demand of purchases of chlorine by Alabama public entities establishes their demand in the 1980's was stable and predictable; 6) High barriers to entry in the repackaging industry make conspiracy plausible; and 7) Conspirators' similar costs make chlorine conspiracy plausible.

An intervenor complaint was filed October 7, 1992, and amended October 19, 1992. On December 7, 1992, the complaint was amended to add additional defendants. During the period of discovery the court granted motions to dismiss complaints filed on behalf of several plaintiffs and dismissed Mayo Chemical Company as a defendant. The parties now stand as listed in the style of the case.

Based on the allegations set forth, plaintiffs seek compensatory damages for defen-

---

**11.** Chlorine is only one of two to three thousand products which PB & S sells throughout the United States. It is one of approximately two hundred commodity type chemicals sold by PB & S.

**12.** The Sherman Act prohibits **express agreements** and monopoly. *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. ——, ——, 113 S.Ct. 2578, 2591, 125 L.Ed.2d 168, 190, *reh'g denied,* —— U.S. ——, 114 S.Ct.

13, 125 L.Ed.2d 765 (1993) (emphasis added). The Sherman Act does not prohibit firms in a concentrated market from coordinating their behavior and sharing monopoly power to obtain supracompetitive profits **unless there is an express agreement.** *Id.*

**13.** Plaintiffs' amended complaint alleges fraud under Ala.Code § 6–5–100, *et seq.* (1975).

dants' "illegal conspiracy to restrain trade by fixing prices, allocating markets, and rigging bids for sale of repackaged chlorine." They seek a permanent injunction to restrain such behavior plus compensatory damages for fraudulent practices associated therewith.

On August 22, 1994, Industrial filed a motion for summary judgment. Jones and Van Waters joined Industrial's motion. On August 25, 1994, PB & S filed a motion for summary judgment, followed by a motion by Harcros the next day. These motions are now before the court, as well as motions to exclude proffered expert testimony of Dr. Robert F. Lanzillotti,[14] Dr. James T. McClave,[15] and Mr. Perry Garner,[16] and to strike the declaration of Barbara Krysti.

## I. CASE HISTORY

Prior to the institution of this suit the United States Justice Department convened a grand jury to investigate the chlorine industry, subpoenaing thousands of documents from the defendants in this case and from others. Numerous witnesses were questioned. After a lengthy investigation, the Justice Department dropped its investigation and returned the documents to their owners.[17]

A 1989 investigation of the chlorine industry by the Florida Attorney General resulted in the filing of two federal antitrust suits: the "peninsula" case filed in Jacksonville, Florida, and the "panhandle" case filed in Pensacola, Florida. After reading summary judgment briefs and hearing oral arguments in the "panhandle" case, Judge Vinson announced he would grant defendants' motion for summary judgment. At that point the State of Florida agreed to settle both cases for partial recovery of its litigation expense.[18] The instant case, filed July 15, 1992, had been filed prior to the Florida settlement.[19]

14. Robert F. Lanzillotti. Dean Emeritus, Eminent Scholar Professor of American Economic Institutions and Director, Public Policy Research Center, Graduate School of Business, University of Florida, 1986–Present. Dartmouth College B.A.1943. American University, B.A., M.A., 1946,47. University of California at Berkley, Ph.D. 1953. Dr. Lanzillotti has served as a business consultant to varied businesses and law firms and divisions of various state and federal agencies. He has written numerous books and papers on economics.

According to Lanzillotti, "Economists only deal with the phenomena they see, costs and prices and the other variables...."

15. Dr. McClave is a statistician. He taught business and economic statistics for ten years at the University of Florida, "including basic econometric modeling (economics and statistics), to students majoring in economics and other fields of business. He has written six textbooks, including one, in its sixth edition, entitled *Statistics for Business and Economics.*"

Dr. McClave founded Info Tech in 1977 and has served as its president since that time. The company now has approximately 50 employees. According to the introduction of his report, Info Tech "performs litigation consulting and software development, and its mission has involved analysis of antitrust behavior in sealed bid markets since its inception."

Dr. McClave's job at Info Tech "has been to develop computerized statistical and economic tools to assist in the litigation of antitrust cases." He became involved in this endeavor as a result of a research grant received in 1977 under the sponsorship of the U.S. Department of Justice

and administered by the Florida Attorney General's office. Dr. McClave has been qualified as an expert in statistics and econometrics in a number of federal and state courts, including at least 40 antitrust cases. Dr. McClave never studied economics in graduate school. His peers are others with Ph.D.'s in statistics. **He himself admits he is not qualified to testify on economic theory.**

16. C.P.A.

17. The Justice Department did not drop its investigation until after this suit had been filed.

18. Industrial refused to contribute anything to the settlement.

19. Alabama's then Attorney General Don Siegelman solicited Alabama municipalities to authorize him as Attorney General to bring an antitrust action. He appointed Richard A. Arnold and John C. Hall III as Special Assistant Attorneys General with reference to "Chlorine Antitrust Litigation." T.W. Dudley Perry, Sr., was later appointed a Special Attorney General with reference to "Chlorine Antitrust Litigation." Successor Attorney General Jimmy Evans declined, on behalf of the State of Alabama, to participate in the proposed antitrust litigation. Consequently, suit was filed by individual entities that dealt with chlorine repacking and distribution companies.

Drs. McClave and Lanzillotti both testified they advised the Florida Attorney General a bid-rigging conspiracy did not exist in peninsular Florida. Defendants maintain the parties settled those "baseless lawsuits" to save litigation ex-

## II. DIRECT EVIDENCE

Aside from the testimony of plaintiffs' experts, there is no direct evidence of any conspiracy. Dr. Lanzillotti himself testified he had no information there had been any meetings or direct communications, i.e. notes, letters or telephone calls, between any of the defendants concerning the pricing or allocation of chlorine or anything that would be considered conspiratorial.[20] He based his work on the bidding patterns.

Plaintiffs maintain defendants had ample opportunity to conspire at annual meetings hosted by chlorine suppliers and at various chlorine committee meetings. The allegation that defendants spoke frequently by telephone is unsubstantiated.

## III. EXPERT TESTIMONY

■ Since there is no direct evidence of conspiracy, expert testimony must be carefully scrutinized. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Court held that the Federal Rules of Evidence provide the standard for admitting expert scientific testimony in a federal trial.

■ Fed.R.Evid. 402 is the baseline for interpreting the federal rules:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

In *Daubert* the Court defined "relevant evidence" as "that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" 509 U.S. at

——, 113 S.Ct. at 2794, 125 L.Ed.2d at 479. The Court went on to discuss the reliability factor of expert evidence in the following manner:

A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." ... Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique that has been able to attract only minimal support within the community," ... may properly be viewed with skepticism (citations omitted).

509 U.S. at ——, 113 S.Ct. at 2797, 125 L.Ed.2d at 483.

In speaking for the Court Mr. Justice Blackmun suggests the following factors, considered by the Court in the instant case, to be considered in a Fed.R.Evid. 104(a) inquiry:

1) Whether the theory or technique can be and has been tested;

2) Whether the theory or technique has been subjected to peer review and publication;

3) The known or potential rate of error or the existence of standards; and

4) Whether the theory or technique used has been generally accepted.

*Id.* at ——, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 483.

The Supreme Court has interpreted Fed.R.Evid. 702 as imposing two distinct requirements for the admissibility of scientific expert evidence: 1) the evidence must be *reliable*[21] and 2) the evidence must be *relevant*[22]. *Daubert*, 509 U.S. at ——, 113 S.Ct. at 2790, 125 L.Ed.2d at 475.[23]

---

penses. Even were there grounds for settlement, evidence of settlement is not admissible to prove liability. Fed.R.Evid. 408.

**20.** Although Dr. Lanzillotti asserted such discussions took place in his report, in deposition testimony he conceded he had no evidence such discussions took place.

**21.** 509 U.S. at ——, ——, 113 S.Ct. at 2795, 2797, 125 L.Ed.2d at 482–84. Specifically, the

court's standard was that the expert's testimony reflect "scientific knowledge," "derived by the scientific method," amounting to "good science."

**22.** The "fit" requirement.

**23.** *Daubert* was before the Supreme Court on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 951 F.2d 1128, 1131 (9th Cir.1991) (Affirmed the district court's grant of summary judgment because the opinions proffered by plaintiffs' experts

In pursuing allegations of trade restraints plaintiffs have relied primarily on the testimony of two expert witnesses: Dr. Robert F. Lanzillotti, economist, and Dr. James T. McClave, statistician, both of whom submitted reports prepared specifically for this litigation. Significantly, on remand the Ninth Circuit *Daubert* court held one "very significant" factor to consider is whether an expert is proposing to testify about research conducted independently of the litigation or developed for the purpose of testifying.

### A. *Lanzillotti*

At the request of attorneys representing various public entities in Alabama, Dr. Lanzillotti prepared his May 20, 1994, report on the "Alabama Chlorine Litigation"—"an economic analysis of market structure and competitive behavior of repackagers of containerized chlorine (CI) in 2000# and 150# cylinders, in Alabama over the period 1980 to date." Report of Robert F. Lanzillotti on the Alabama Chlorine Litigation, May 1994, p. 1. Lanzillotti defined his task in the May 1994 report in the following manner:

> to determine whether repackagers of chlorine engaged in a scheme to fix prices or allocate customers among themselves, as outlined in the Complaint. In my opinion, the totality of the evidence adduced so far in the litigation supports the conclusion that such a conspiracy did, in fact, operate during the 1980s.

Lanzillotti Report, p. 7.

In determining defendants were engaged in cartels and other collusive arrangements, Lanzillotti outlined basic common economic characteristics: 1) "[C]artel occurrence is most common in markets with few sellers [**two to six firms**] (emphasis added)." Lanzillotti Report, p. 9. 2) High concentration appears to be most conducive to cartelization

efforts. 3) Conditions are most conducive to cooperation among sellers in industries selling products that are standardized or homogeneous—as repackaged liquid chlorine. 4) The elasticity of demand for a product may also constitute a condition conducive to collusion. 5) In markets in which cost components[24] are virtually the same, collusion is much easier to implement. 6) Generally, market conditions involving frequent, predictable sales are most accommodating to bid rigging and collusion. 7) The nature of sealed-bid/public announcement of winning bidder and winning bid—exemplified by identical sealed bidding, simultaneous price increases, and related practices—constitute a built-in communication network for repackagers. Lanzillotti summarized in the following manner:

> [E]conomic analysis and empirical studies indicate that the structural conditions most conducive to collusive activities are those involving a relatively small number of sellers selling homogeneous products with relatively inelastic and predictable demand and a market setting relatively free of rapid technological change in the nature of products, advertising, styling, etc. Moreover, the nature of the sales process, sealed competitive bidding, introduces a complication that induce [sic] sellers to resort to various collusive arrangements in order to achieve their common objectives. The liquid chlorine industry, notably the activities of repackagers/distributors fits these market conditions and product characteristics very closely; hence, it is not surprising to discover the presence of collusive activities.

Lanzillotti Report, p. 11.

In reaching a conclusion that the defendants were engaged in a conspiracy, Dr. Lanzillotti chose as his market study the

---

ran counter to the substantial consensus in the scientific community). *Daubert* remanded the case to the 9th Circuit to consider the admissibility of plaintiffs' expert testimony under Fed. R.Evid. 702, which superseded the Frye test—scientific evidence was admissible if based on a scientific technique generally accepted as reliable within the scientific community—the standard

for admissibility of expert testimony in the circuit at the time. *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). On rehearing the 9th Circuit affirmed the district court's grant of summary judgment. 1995 WL 1736 (9th Cir.).

**24.** These components in the repackaged liquid chlorine industry are raw chlorine cost, packaging cost and cost of delivery to the customer.

entire Southeastern United States [25] with the exception of Texas, Louisiana and the peninsula of Florida. Submarkets included: (1) Alabama and the Florida panhandle, further subdivided into northern and southern markets; 2) peninsular Florida; and 3) Georgia. Lanzillotti delineated the market area by noting prices, price changes, and stability of prices, defining the broad geographic market as the Southeastern United States. The delineated market area contains at least 70 chlorine vendors. Even so, Dr. Lanzillotti acknowledges it is difficult to find a conspiracy, or cartel unless there are limited suppliers, normally **two to six.** Not only could he not remember having seen a cartel in a market that had more than ten vendors, he cited a study which says that 79 per cent of cartels are in markets served by ten vendors or less. In Lanzillotti's Southeast market area, however, no less than 17 different chemical companies bid for repackaged chlorine contracts in Alabama during the alleged conspiracy period. At least five chemical companies that are not defendants or identified as conspirators won bids for which plaintiffs are claiming damages.[26]

Based on his analysis of the Southeast operation generally, and Alabama specifically, Dr. Lanzillotti opined:

> The information currently available relative to the Southeast discloses that prices of containerized chlorine to these public entities in Alabama during the period in question were not determined by free and open competition among suppliers. In consequence, public entities paid higher prices than would have prevailed in a truly competitive market.

Lanzillotti Report, p. 1.

Dr. Lanzillotti identified and isolated the product and its relevant geographic markets, noting the following:

> [T]otal demand ... is "inelastic" with respect to price, i.e., dollar sales tend to increase less-than-proportionately with re-

ductions in price. ... Hence, given a market structure consisting of only a few major sellers, economic analysis tells us that the prices of a homogeneous [i.e., "fungible"] product like chlorine, price cuts by one seller normally will be followed by other competitors."

Lanzillotti Report, p. 2.

Lanzillotti opines that from 1984 through 1990, based on straight economic analysis and empirical pricing data, the price-cost margin reflected in the Alabama chlorine industry was noncompetitive. Non-bid customers typically paid list price.

In the case of Harcros, bids were determined primarily by branch managers. Factors considered in calculating bid amounts were distance between the company and municipality, the number of available cylinders, the cost of the product, and the prices in the market. Upon determining the price, managers contacted regional vice president Joseph Ragusa for approval of the recommended bid. The responsibility of deciding the amount of the bid was primarily with the district manager.

Lanzillotti places importance on written comments by Joseph Ragusa on memoranda received from one Harcros salesperson and forwarded to the remaining members of his sales staff (typically 10 to 15 people). Lanzillotti cited as an example of conspiratorial behavior Mr. Ragusa's January 1985 memorandum, and attached copy of McKesson Chemical's price list for chemicals sold in Texas and Oklahoma to his salespeople, in which he asked Harcros salespeople to be on the lookout for price lists in their areas. "I have heard that their sales people will not be allowed to deviate from these list prices without a manager's approval. If they stick to this plan, it can benefit all of us as each chemical distributor faces the same problems—rising costs such as insurance, E.P.A., etc., and low margins must be improved." [27] Lanzillotti Report, p. 15.

---

25. According to Dr. Lanzillotti this entire area has similar pricing patterns.

26. Apperson Chemical, American Industrial, Mid–American Chemical, Mobile S & S Co., and Southland Chemicals.

27. Defendants argue that rather than being conspiratorial, Ragusa's statements are consistent with competition in which Harcros is seeking information about the marketplace. Were there a bid rigging conspiracy, there would be no need

Lanzillotti also refers to a Ragusa notation on a memorandum written by J.L. Smith of the Atlanta Harcros office to his boss, Mike Stringer, about bid results on products, including chlorine, at Carrollton, Georgia. In a hand written notation on the March 25, 1988, Smith memorandum, Mr. Stringer noted the VW & R (Van Waters) bid of $.2750 as a "signal to get prices up." To the Stringer notation, Ragusa added: "We have an indication that VW & R trying to increase tons to $.275 lb. on tons. We need to support this move in the markets we are seeing it. Be sure to do it."[28]

As evidence the defendants were exchanging price information, plaintiffs refer to two memoranda written by Mr. Ragusa in April 1985 in which he mentions a new Jones price list.[29] Lanzillotti opined exchanging of price lists was not limited to Harcros. "PB & S regularly distributed its intended consumer bid pricing to Industrial, under the guise that their Pricing Structure to Industrial required that Industrial be given a discount off of the consumer prices."

As further examples of a pricing conspiracy, Lanzillotti noted Ragusa's comments: "Arkla & Dixie still have not discovered the new world," and "Ed Morgan at Arkla still in dark."[30]

According to Lanzillotti cross-elasticity of demand helps identify the relevant product market for antitrust purposes. Products that have a high cross-elasticity of demand are considered similar or identical products for purposes of economic analysis. Lanzillotti stated: "[I]t is my judgment that the relevant product for purposes of this Complaint is clearly liquid, containerized chlorine

(CI) used for treatment of water and sewage. There are no close substitutes." Lanzillotti Report, p. 3.

In discussing price differentials Lanzillotti noted acknowledgments by various personnel of defendants. Joseph Ragusa[31] conceded there was nearly a $250.00/ton difference in price between (a) panhandle Florida (approximately the same price as rest of Southeast), and (b) peninsular Florida. Mr. Ragusa attributed the disparity to "competition." He later attributed the disparity to "market conditions," as did Robert Jones, president of Jones, and Darwin Simpson of Van Waters.

In addressing the concepts of price fixing" (which can take the form of bid rigging), "collusion," and "conspiracy to restrain trade," Lanzillotti said: "Competitors who agree among themselves to rotate the winning bid, to bid purposely 'low', [sic] or to bid in some other collectively determined and artificial fashion to allocate customers or territories are engaged in price-fixing under the antitrust laws." Lanzillotti Report, p. 7.

Dr. Lanzillotti contends the following factors convinced him the defendants participated in bid rigging in the repackaged chlorine market in Alabama.

(1) signaling with complementary [sic] bids to nonincumbencies as a means of securing an agreement to raise the market price; (2) refusal to bid certain public entities; (3) a pattern of "courtesy" or "complimentary" [noncompetitive bids]; (4) frequency of identical or essentially identical bidding; (5) bidding at straight "book" or "list" price with an apparent [if not express] expectation of not winning the bid; and (6)

---

for the sales people to be on the lookout for McKesson price lists.

**28.** Again defendants contend that rather than showing direct communication between Harcros and Van Waters, the notes indicate Mr. Ragusa and Mr. Stringer were reading and interpreting the prices in the market prior to deciding what was best for their company. Had there been an agreement between Harcros and Van Waters, the memoranda would not have existed.

**29.** Rather than having access to a Jones price list, Ragusa explained the information had been reported to him from field people who had picked up the information.

**30.** Ragusa explained the comments were made in relation to Arkla and Dixie's having bid $310.00/ton and $314.00/ton respectively on an account in which Harcros had bid $400.00. Ragusa's interpretation was they could make more money if they bid higher.

The court notes that comments Ragusa made relative to pricing in Georgia were speculation only.

**31.** As Harcros Vice President Southeast Region, Mr. Ragusa's sales territory included Florida and Alabama, as well as most of the states in the Southeast.

the very sharp contrast between (a) prices in Alabama and the southeast in general and (b) peninsular Florida (and other submarkets affected by non-conspirator Allied)[32] throughout the period under review.

Lanzillotti Report, p. 15.

Dr. Lanzillotti reached the following "ultimate conclusion:"

Defendants were using explicit price signals through bids not intended to win contracts in order to reach an agreement to bid (and quote) higher prices, while always honoring one another's incumbencies. This is, in my opinion, *explicit* price fixing, since essentially there is no doubt about either the price or the intended winner of any contract (or, at least, of any contract over which the Defendants have control).

Lanzillotti Report, pp. 24–25.

## B. *McClave*

In conjunction with Dr. Lanzillotti's analysis, Dr. McClave performed an analysis of Dr. Lanzillotti's geographic markets and the product from data of bids and related data for repackaged chlorine sold to municipalities in either one-ton or 150–pound cylinders, or both. From his analysis Dr. McClave concluded vendors' collusive behavior affected the market at least as early as 1984 and continued through 1990. The conclusion of his May 20, 1994, report for the "Alabama Chlorine Case" states the following:

Conspirators honored one another's incumbencies with great regularity throughout that period, and used price signals when bidding into non-incumbencies to communicate proposed moves to new and higher price levels. In fact, analysis of available data throughout the Southeastern market indicates that signs of noncompetitive behavior were prevalent throughout the market during that period, with exceptions only where Allied was an active bidder, or a threat to bid. The result was that public entities throughout the southeastern market in general, and in the Alabama submarket in particular, paid significantly higher prices for liquid chlorine than they would have paid in a competitive market environment.

Report of James T. McClave for the Alabama Chlorine Case, May 1994, p. 14.

Dr. McClave did not prepare the database used in his analysis, but accepted the one prepared by Dr. Lanzillotti, embracing Lanzillotti's definition of the relevant product, geographic markets and submarkets. All of his analyses focus "on the sale of repackaged liquid chlorine to public entities in the Southeastern market," particularly "the geographic sub-market consisting of Alabama and Florida panhandle municipalities that let bids on an annual basis." McClave Report, p. 3. He further divided the submarket into "northern" and "southern" submarkets.

While Dr. McClave concluded the top eight vendors in the market had stable market shares—a sign of collusive behavior—their stable market shares were not sufficient to establish collusion. He therefore examined their bidding behavior, beginning with an analysis of the "incumbency" rate, the percentage of customers whose business is won by the same vendor from one year to the next. "[H]igh incumbency rates during a period of suspected collusive behavior, as compared with another period believed to be more competitive, support the inference of collusion during the suspicious period." McClave Report, p. 5. McClave concluded that incumbency was at the heart of the bidding behavior of the defendants. In discussing the incumbency rates for the Alabama sealed bid submarket (not including the Florida panhandle), McClave called attention to the following:

Note that in 1981 and 1982, the rates are below 50%, meaning that more than half the bid entities were won by different vendors in each of those two years. In 1983 the incumbency rate jumps to 64%, drops back to 50% in 1984, then increases to 78%, in 1985. The incumbency rate peaks in 1986 at 90%, meaning that only 10% turnover in suppliers occurred throughout

---

**32.** Allied Universal operates out of Florida. It moved into the Georgia market and then into Alabama, taking accounts from various defendants. Lanzillotti refers to Allied as the "pricing maverick."

the year. In 1987, the rate remains extremely high at 83%. The incumbency rate never recedes below 50% again, although it returned to 75% in 1990.

McClave Report, p. 5.

McClave found a similar pattern existed in the "northern" and "southern" submarkets. Tie bids occurred on only eight percent of the 1981 contracts, jumping to 75 percent by 1983. Tie bids occurred in about 90 percent of the 1986 and 1987 contracts, falling to zero percent by 1992. He concluded: "The incumbency and tie bid rates in the Alabama chlorine sub-market are indicative of collusive behavior." McClave Report, at 6.

One aspect of plaintiffs' alleged collusion took place in the sealed bids conducted by municipalities. McClave opines the reason municipalities conduct sealed bid auctions is to obtain, within their requirements and specifications, the lowest price for repackaged chlorine. He noted the pattern of competitive behavior began to disappear in 1983, with prices rising steadily from May onward. The incumbency rate jumped to 80 percent, meaning that only two bids turned over during 1983. McClave opined that higher, less dispersed bids are "atypical of competitive markets." He cited the following:

> By 1985, all bidders are acting in concert. The "going" price is $400 per ton, a price from which VW & R [33] never deviates. By September, everyone is bidding at this level. In 1986 the bid level moves to $450 per ton, and everyone is in line. Only where there is concern that the tie bid might not go to the incumbent does the incumbent bid slightly below the established price, as in Okaloosa (FL).

McClave Report, p. 8.

McClave cites the best examples of price signaling appeared in the 1987 "southern" submarket. Chemicals, Inc., a Jones distributor (not a defendant) signaled at $500.00 per ton in its January bid to Panama City, Florida. Van Waters responded with its signal at the same level in its April bid to Mobile, a Jones incumbency. Mayo (not a defendant) won Tuscaloosa at that level in September with Jones, Van Waters and Harcros all bid-

ding $500.00 per ton or higher. By 1988, $500.00 per ton was firmly established. Although signals of $550.00 per ton began, McClave concluded defendants were unable to establish the $550.00 figure because of the entrance of Apperson into the market. Contract turnover remained quite low and the incidence of tie bidding quite high.

McClave accounts for Van Waters submitting 39 bids in the southern sub-market during the 1984–1990 period without winning a single bid as a prime example of "complementary" bidding: giving the appearance of more competition to the entity letting the bid, and serving as effective price signals in markets in which it has incumbencies.

McClave found the "northern" submarket showed relatively coordinated bidding behavior as early as 1982 or 1983, moving to $260.00 per ton in 1983. By 1987 the $500.00 level was reached. Disintegration of the coordinated price began in 1988 when Van Waters took the Gadsden contract from Harcros by bidding $450.00, and Mayo took Birmingham from Industrial by bidding $466.00 per ton. The incumbency rate dropped to under 60 per cent. In 1989 Van Waters bid $334.00 to retain Gadsden, and Industrial bid $340.00 to reclaim Birmingham.

Having accepted Lanzillotti's economic analysis of chlorine repackaging costs and their effect on price, McClave focused on price/cost and bid relationships over the period from 1981 through 1992. He concluded winning bid prices did not follow the cost trend: "Note that the pattern of the price-cost relationship, particularly the dramatic separation of price from cost beginning in 1984, holds throughout the Southeastern market, except where Allied is active. This supports the conclusion that the effects of the collusive behavior were manifested throughout the Southeastern market." McClave Report, p. 11.

After concluding defendants had been engaged in collusive behavior in bidding and pricing, McClave provided an econo-metric model to estimate the "but for" competitive price of chlorine.

---

**33.** Van Waters.

## C. Summaries

■ Summaries of data have been submitted in conjunction with the reports of Lanzillotti and McClave. Fed.R.Evid. 1006 permits admission of such summaries.[34] In *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir.1971), the court permitted a summary of *testimony*.[35] Summaries (charts) were "used as an aid in understanding testimony already introduced in the case or documents which were available." Fed.R.Evid. 1006 should be read in conjunction with Fed. R.Evid. 402.[36]

## IV. HEARSAY TESTIMONY

■ Other than plaintiffs' proffered expert testimony, their additional evidence is in the form of hearsay testimony: (A) the Casassas' testimony about what Mr. Jones, their social acquaintance, told them; (B) a handwritten note written by an unidentified person interpreting Mr. Caine's statement that Industrial had submitted a "complimentary" bid, plus Mr. Caine's affidavit; and (C) the statement of Barbara Krysti that her husband Lloyd Krysti told her Joe Ragusa of Harcros was conspiring with his competitors to fix chlorine prices before bids were submitted.[37]

**34.** "The contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."

**35.** Although this was prior to the adoption of the Rules, the holding is applicable.

**36.** "All relevant evidence is admissible."

**37.** Even were the three "confessions" admissible, they would not be admissible against Van Waters or PB & S. They did not employ Robert Jones, Lloyd Krysti or Woody Caine and were not implicated by the content of the "confessions." Nor would *any* of these "confessions" bind more than one party, even if admitted.

**38.** The behavior of Mrs. Casassas ended the friendship between the Joneses and the Casassas. In the spring/early summer of 1985 Mrs. Casassa and a friend traveled from Florida to Caledonia, New York, to satisfy Mrs. Casassa's curiosity about Bob Jones's marital status. Representing themselves as reporters for the *St. Petersburg Times*, they located Bob Jones's residence and took photographs. Upon confronting Mr. Jones they demanded that he get Shirley Jones out of town. When they returned to Florida Mrs. Casassa told her husband and gossiped to her

## A. Loraine and Peter Casassa

■ In an effort to prove the conspiracy, plaintiffs have provided the affidavits of Loraine and Peter Casassa, former social acquaintances and occasional golfing partners of Robert Jones, deceased.[38] The statements were purportedly made in their presence by Mr. Jones, then president of Jones, on the golf course and in the club house of a Florida country club. Allegedly Mr. Jones knew what the bids of unidentified competitors in unidentified markets were before the bids were submitted to unspecified customers. These out of court statements are inadmissible hearsay.

■ Out of court statements by alleged co-conspirators must be made "during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Our circuit succinctly outlined the time when an out of court statement by a co-conspirator is admissible against a defendant when it said:

The Supreme Court has clarified the analysis for determining when a coconspirator's statement is made in furtherance of a conspiracy under Rule 801(d)(2)(E). *Bourjaily v. United States*, 483 U.S. 171,

friends about Bob Jones. Mr. Jones voiced his objections over Loraine Casassa's invasion of his privacy and her subsequent rumor-mongering to Mr. Casassa. The friendship between the couples ended.

As a result Mr. Jones "threatened" the Casassas. His alleged "threat" was in reference to the Casassas' interference with his personal life. It had nothing to do with their business dealings. Plaintiffs argue the "threat" pertained to business dealings between Jones and the Casassas' firm, Chemicals, Inc. Chemicals, Inc. is not a defendant in the instant case. It only bid in the Florida panhandle area. Any relationship between Bob Jones of Jones Chemicals and the Casassas of Chemicals, Inc. has no probative value as to whether there was a conspiracy in Alabama. Furthermore, the Casassas seemed to understand that the "threat" involved their meddling in the personal relationship between Bob and Shirley Jones. Moreover, any threat made by Mr. Jones to the Casassas is inadmissible against the defendants for the following reasons: 1) The evidence does not establish a conspiracy; 2) Mr. Jones's statements could not have furthered the alleged conspiracy; and 3) The alleged statements do not identify any defendant as a conspirator.

107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Before admitting a coconspirator's statement over an objection that the statement does not qualify under Rule 801(d)(2)(E), a district court must be satisfied that the party offering the testimony has proved by a preponderance of the evidence that the declarant and the defendant were involved in an existing conspiracy and that the statement was made during the course and in furtherance of the conspiracy.

*United States v. Byrom,* 910 F.2d 725, 734 (11th Cir.1990). *See* 2 J. Strong, *McCormick on Evidence,* § 259, at 165 (4th ed. 1992) (The statement or declaration of a co-conspirator must have been made while the conspiracy was in progress and must have constituted a step in furtherance of the venture); 2 J. Strong, *McCormick on Evidence,* § 259, at 167 (4th ed. 1992) ("Preliminary questions of fact with regard to declarations of coconspirator are governed by Federal Rule 104(a)[39] and must be established by a preponderance of the evidence."). Plaintiffs have failed to prove this necessary step. Other than inadmissible hearsay testimony, no direct evidence of a conspiracy has been presented.

The Advisory Committee's Notes on Admissions under Fed.R.Evid. 801(d)(2) state: "The limitation upon the admissibility of statements of co-conspirators to those made 'during the course and in furtherance of the conspiracy' *is the accepted pattern.* While the broadened view of agency taken ... might suggest wider admissibility of statements of co-conspirators, the agency theory of conspiracy is at best a fiction and *ought not* to *serve as a basis for admissibility beyond that already established.* ... The rule is consistent with the position of the Supreme Court in denying admissibility to statements made after the objectives of the conspiracy have either failed or been achieved." (emphasis added).

 Even were Mr. Jones's statements admissible exceptions to the hearsay rule, they are not binding on Jones Chemical. Other than the Casassas' testimony, plaintiffs have laid no foundation to prove that the conversation took place or if it did that Jones was speaking for the company. The court assumes plaintiffs want the Casassas' statements admitted on an alter ego theory, but they have offered nothing to suggest to the court the corporate shield should be pierced. They have failed to prove the statements were made in Florida or what the Florida alter ego law is. Furthermore, they have failed to introduce evidence of the alter ego law in any state. Since the federal court is sitting in Alabama, the court has the right to apply Alabama law. In Alabama the president of a corporation is not the "alter ego" of the corporation. To be the "alter ego" the person must be the "general superintendent" or "manager." While Mr. Jones may have acted in one or both of those capacities, plaintiffs have introduced no evidence to that effect. "A person who holds the office of president of a corporation is not assumed, in the absence of evidence to the contrary, to have any authority to act or speak for the corporation." C. Gamble, *McElroy's Alabama Evidence,* § 195.01(7), at 522 (4th ed. 1991) (citing *Jerome H. Sheip, Inc. v. Baer,* 210 Ala. 231, 97 So. 698 (1923)). In an action against a corporation, the declarations or admissions of its president cannot be received to establish a liability against it. *Henry & Co. v. Northern Bank of Alabama,* 63 Ala. 527, 537 (1879). Accordingly, anything Mr. Jones may have said is not binding on Jones Chemical.

### B. *Woody Caine* [40]

 The only evidence offered by plaintiffs of participation by Industrial in a conspiracy is the margin note by an unidentified person at the Board of Water and Sewer Commission of the City of Mobile to a May 5, 1987, bid tabulation which reads:

**39.** (a) **Questions of admissibility generally.** Preliminary questions concerning ... the admissibility of evidence shall be determined by the court....

(Footnote not in text of quoted material.)

**40.** Mr. Caine, a former Industrial employee, is now a partner in Water and Waste Specialties Co. According to his affidavit he was a Mobile and Dothan sales manager for Industrial from 1985 to 1990.

* This is a complimentary bid [41] As per O.W. Caine, Sales Manager, pass contract on to Jones Chem. 4/28/87

The margin notation is erroneous for several reasons. It is the **interpretation** by an unidentified person of what Mr. Caine said, not what he said. Mr. Caine was not **the** sales manager; he had no authority over bids. Mr. Welch, the only person at that time responsible for bidding chlorine, had to approve Mr. Caine's quotation of something other than list price to a buyer. Caine and Welsh never spoke about this 1987 Mobile bid. Therefore, had Mr. Caine said anything about the bid it was an unauthorized statement. Significantly, Dr. Lanzillotti never mentioned the margin notation when asked to list everything that indicated that Industrial was a conspirator. The notation is inadmissible.

Plaintiffs have additionally offered Mr. Caine's affidavit as evidence that Jones exercised complete control over chlorine bidding by Industrial. Mr. Caine's affidavit testimony concerning the Jones/Industrial tie bid, however, is ambiguous: 1) He learned of the tie from Joyce Whitworth; 2) William Welch told him Industrial needed to bow out gracefully; 3) Caine told Mrs. Whitworth and the Mobile bid was awarded to Jones. None of his testimony establishes conspiracy. Caine admits in his declaration that Mr. Welch told him "to bow out gracefully, because it would not be to Industrial's long-range advantage to get into a fight with its supplier over this one bid." Mr. Caine adds that he "would have recommended doing the same thing." Although Industrial wanted the Mobile business, it also needed to preserve its source of supply in South Alabama. Fighting with its sole supplier in the supplier's hometown over this single bid would show bad business judgment.

The other portions of Mr. Caine's affidavit add nothing. Events setting forth what Industrial and Jones home offices did are inadmissible hearsay. Mr. Caine was not an active participant and had no first-hand knowledge. His memory of events in Jackson, Mississippi, from 1978 through April 1984, has no bearing on the case at bar. Furthermore, recitation of bid procedures followed in New Orleans from April 1984 through October 1985, when he left Industrial's employment, establish Mr. Caine had no authority over chlorine bids. At best Mr. Caine's testimony is hearsay. He has no first-hand knowledge of the procedures he recounts.

Neither can the affidavit stand alone. Mr. Caine clarified his October 7, 1994, affidavit by declaration of October 26, 1994. Had the evidence established Mr. Caine had authority over chlorine bids, his subsequent declaration establishes he never intended to suggest knowledge of a conspiracy. His declaration includes significant information not included in his earlier affidavit. "[A]ll bids that were submitted on behalf of Industrial were with the full hope of getting that business and without any knowledge of what Jones might be planning to bid." His affidavit was not meant as an admission of wrongdoing. "I was never personally involved in any bidrigging and have no knowledge of Industrial being involved in any bidrigging." His earlier reference to Industrial's giving bid information to Jones referred "to the day-to-day contacts between Industrial as a distributor and Jones as a supplier." "[T]hose contacts took place as a part of Industrial's efforts to obtain price support from Jones for long-term chlorine contracts." "[C]hlorine distributors need(ed) price support to bid competitively on long-term contracts."

For the above-cited reasons the court strikes the affidavit of Woody Caine.

## C. *Barbara Krysti*

Plaintiffs have submitted the affidavit of Barbara Krysti, the widow of Lloyd Krysti, a former Harcros employee. By affidavit Mrs. Krysti testifies her husband told her Mr. Joseph Ragusa was "getting together with his competitors and fixing the price of chlorine before bids were submitted." Not only is no independent source for the information given, Lloyd Krysti did not have the authority to bid chlorine; Joe Ragusa

---

41. In the case of a complimentary bid the bidder submits a high bid so he will not be awarded the bid. A complimentary bid may be submitted in order to keep one's name on the bidding list.

did. Lloyd Krysti's statements, therefore, are not statements within his authority. They have no probative value. Not falling within any exceptions to the hearsay rule, the double hearsay testimony of Barbara Krysti is inadmissible.

## V. CASELAW HISTORY

Plaintiffs claim defendants participated in vertical restraints of trade—restraints imposed by the seller on the buyer. Pertinent to the decision of the court today is a series of cases dating to the beginning of the century. In *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), the court ruled that a manufacturer's mere advance announcement that it would not sell to price-cutters did not violate the Sherman Act.[42] "The purpose of the Sherman Act is . . . to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." 250 U.S. at 307, 39 S.Ct. at 468.

Through the years the principles governing vertical arrangements moved in the direction of condemnation by holding **per se illegality**. In 1977, however, in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the court brought this era to a close when it returned to the **rule of reason**—a situation in which "the fact-finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." 433 U.S. at 49, 97 S.Ct. 2549, 53 L.Ed.2d at 580.[43]

Thereafter, in the price fixing case of *Monsanto Company v. Spray–Rite*, 465 U.S. 752,

104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), *reh'g denied*, 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984), the Court held it was natural for a manufacturer and its dealers to communicate constantly about prices and sales tactics. Before a conspiracy to fix prices can be inferred there must be evidence to exclude the possibility that the manufacturer and distributors were acting independently. "[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' *Edward J. Sweeney & Sons, supra*,[44] at 111." 465 U.S. at 764, 104 S.Ct. at 1471, 79 L.Ed. at 785–86. (Restated in conclusion 465 U.S. at 768, 104 S.Ct. at 1470, 79 L.Ed.2d at 788 (1984)).

Two years later, in *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538, 553 (1986), the Supreme Court reiterated its position by stating:

> [W]e held (in *Monsanto*) that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. . . . To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently (citations omitted).

The court went further to hold that if parties to an alleged conspiracy had "no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." 475 U.S. at 596–97, 106 S.Ct. at 1361, 89 L.Ed.2d

**42.** Later the court moved away from the *Colgate* holding, only to return to its principle in more recent years.

**43.** Of interest is Judge Posner's response (identified in footnote 49 on page 44) when asked if market concentration is an appropriate thing to look at in vertical restraint analysis under *Sylvania:* "I don't think you would want to condemn resale price maintenance or other vertical restrictions just because of a concentrated market.

It is true that these vertical restrictions, particularly resale price maintenance, would make it easier to police a cartel of manufacturers, but that seems a pretty thin basis on which to condemn an industry-wide practice."

**44.** *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3rd Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

at 558–59. As to permissible inferences, the court stated:

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray–Rite Service Corp.*, ..., we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.

475 U.S. at 588, 106 S.Ct. at 1356, 89 L.Ed.2d at 553. *See also, Bolt v. Halifax Hosp. Medical Center,* 891 F.2d 810, 819 (11th Cir.), *cert. denied,* 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). ("[A] plaintiff must adduce evidence that tends to exclude the possibility that the alleged co-conspirators acted independently and in a manner consistent with rational business objectives.").

The Supreme Court followed the *Monsanto* and *GTE Sylvania* principles in the price cutting case of *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 726, 108 S.Ct. 1515, 1520–21, 99 L.Ed.2d 808, 818 (1988), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1727, 100 L.Ed.2d 192 (1988), when it stated the following:

> "[T]here is a presumption in favor of a rule-of-reason standard; that departure from that standard must be justified by demonstrable economic effect, such as the facilitation of cartelizing, rather than formalistic distinctions; that interbrand competition is the primary concern of the antitrust laws; and that rules in this area should be formulated with a view towards protecting the doctrine of GTE Sylvania."

Following the law, as set by the Supreme Court in the above *Monsanto/Matsushita* rule, the Eleventh Circuit, in the price fixing case of *Helicopter Support Systems v. Hughes Helicopter,* 818 F.2d 1530, 1532–34 (11th Cir.1987),[45] noted that the court had modified the general summary judgment standard for antitrust violations. The circuit discerned a two-step test which the antitrust plaintiff must survive in order to avoid summary judgment: 1) "[T]he plaintiff must satisfy the court that the conspiracy which he alleges is, objectively, an economically reasonable one;" 818 F.2d, at 1534; and 2) The plaintiff "must also be able to point to evidence which tends to exclude the possibility that the manufacturer was operating independently." *Id. See also, Dunnivant v. Bi–State Auto Parts,* 851 F.2d 1575, 1579 (11th Cir.1988) (The nonmoving party must come forward with specific facts to present evidence excluding the possibility of independent action.) (citing *Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority,* 801 F.2d 1286, 1291 (11th Cir.1986)). *But see, In re Coordinated Pretrial Proceedings,* 906 F.2d 432 (9th Cir. 1990), *cert. denied,* 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991) (Court found defendants' detailed price announcements were of no use except to communicate price changes to competitors).[46]

*Dunnivant,* 851 F.2d at 1583, specifically addressed the argument espoused by plaintiffs and advanced by Dr. Lanzillotti in the case at bar, "Conscious Parallelism," by stating:

> Dunnivant also attempts to link the appellee suppliers with the appellee retailers on a theory of conscious parallelism. He argues that each of the individual suppliers was aware of the retailers' conspiratorial objective, thereby constituting a violation of the Sherman Act. Proof of parallel behavior alone does not establish a *prima facie* case of a Sherman Act violation. In order to avoid a motion for summary judgment, a plaintiff must come forward with significant probative evidence supporting its theory of conscious parallelism with some "plus" factor which tends to indicate the absence of independent action. In addition, it must be shown that the decisions not to deal were contrary to the defen-

---

45. This was a distributor-termination case.

46. This part of *Petroleum Products* has not found acceptance elsewhere. The facts in *Petroleum Products* are not on point with the facts in the instant case. Here price announcements were not made. Sealed bids were submitted as a part of the municipally-established procedures for awarding business—a legitimate business purpose. Even were *Petroleum Products* on point, the decision is inconsistent with the Eleventh Circuit *Dunnivant* decision which this court must follow.

dants' economic self-interest so as to raise an issue of good faith business judgment.

Thus, our circuit has held additionally that in order to survive a summary judgment motion, the antitrust plaintiff must prove a "plus" factor (something strongly suggesting the presence of a price-fixing agreement). *See also, Bolt v. Halifax Hosp. Medical Center,* 891 F.2d 810, 826 (11th Cir.1990) ("The rule in this circuit is that evidence of conscious parallelism does not permit an inference of conspiracy unless the plaintiff establishes that each defendant engaging in the parallel action acted contrary to its economic self-interest"). *See E.I. DuPont de Nemours & Co. v. FTC,* 729 F.2d 128, 139 (2nd Cir. 1984) ("The mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws"); J. Kattan, *Beyond Facilitating Practices,* 63 ANTITRUST L.J. 133, 145 (1994) (The Justice Department "appeared to concede that a public announcement that communicates information that is useful both to consumers and to rivals is beyond the reach of Section 1 of the Sherman Act").

Defendants' "plus factor" was reaping higher profits in an oligopolistic market. "When a business justification for the parallel conduct is apparent and no evidence is presented to support an alternative explanation, evidence of conscious parallelism is insufficient to prove a conspiracy." J. Kattan, *Beyond Facilitating Practices,* 63 ANTITRUST L.J. 133, 140 (1994). Defendants' financial records do not support plaintiffs' contention of "dramatically increased profits" on chlorine.

■ In arguing that *Matsushita* did not change the standard for summary judgment, plaintiffs have cited the holding in *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), in which the court held the photocopier manufacturer was not entitled to summary judgment, dismissing federal antitrust claims as to (1) tying arrangement between parts and service, and (2) monopolization of sale of service. Plaintiffs directed the court's attention to the following passage:

The Court's requirement in Matsushita that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enumerates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

504 U.S. at ——, 112 S.Ct. at 2083, 119 L.Ed.2d at 285. The court finds no fault with plaintiffs' ensuing conclusory argument: "Thus, if a plaintiff's theory is supported by substantial evidence and is economically plausible, summary judgment must be denied." The cited passage and conclusion drawn are consistent with the holdings of the Supreme Court and our circuit. It is only when a plaintiff's theory is **unsupported by substantial evidence and is economically implausible** that summary judgment should be granted.

Following the principles of *Monsanto/Matsushita* and *Dunnivant,* Judge Propst granted an antitrust summary judgment in *Gas Utilities Company of Alabama, Inc. v. Southern Natural Gas Co.,* 825 F.Supp. 1551 (N.D.Ala.1992), *aff'd,* 996 F.2d 282 (11th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 654 (1994), with the following words:

The principles set forth in *Dunnivant v. Bi–State Auto parts,* 851 F.2d 1575 (11th Cir.1988) govern plaintiff's "conscious parallelism" claim. The *Dunnivant* court held that a plaintiff must demonstrate that the decision not to deal was contrary to a defendant's economic business interest so as to raise an issue of good faith business judgment. *Id.* at 1583. In the instant case, defendant Southern has proffered sound business reasons .... Moreover, GUA [plaintiff] has offered nothing to re-

fute Southern's justification (footnote omitted).

825 F.Supp. at 1573.

██ Furthermore, the mere fact that defendants use identical price lists does not show a price-fixing agreement. *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37 (7th Cir.1992). The *Reserve Supply* court quoted *DuPont v. FTC*, 729 F.2d 128, 139 (2d Cir.1984), when it said: "[T]he mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws." *See also, Market Force, Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1172 (7th Cir.1990) ("[C]onscious parallelism by itself is not enough to support an antitrust conspiracy case."); *Clamo–All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 484 (1st Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989) (The use of identical price lists by competitors in a concentrated industry does not show a price-fixing agreement.)

██ Plaintiffs have argued defendants' use of discounted prices to meet prices of regional competitors was an indication of illegal agreements, pointing to the price differential between bids in peninsular Florida and bids in the rest of the United States. In doing so they ignored the compelling economic justifications for the differentials: 1) repackaged chlorine contracts in peninsular Florida are significantly larger than contracts in Alabama; 2) peninsular Florida has a significantly larger supply of repackaged chlorine than Alabama;[47] and 3) a significantly greater number of entities bid in Florida than Alabama.[48] A similar argument relating to price differentials was rejected in *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 52 (7th Cir.1992), when the court stated:

> [B]ecause of the interdependence of the market, one producer cannot maintain higher prices than another without risking a loss of market share. ... Meeting the

discounts of the new regional competitors does not suggest necessarily a conspiracy to maintain higher prices in other regions. These actions well could have been independent decisions of Owens–Corning and CertainTeed to cut prices in order to preserve market share.

## VI. CRITIQUE LANZILLOTTI/McCLAVE ANALYSIS

### A. *Lanzillotti*

The periodic occurrence of identical bids for some municipal chlorine contracts in Alabama during 1984 to 1990 constitutes the primary empirical cornerstone for the Lanzillotti/McClave opinions that defendants engaged in illegal collusive behavior. These bids must be viewed against the backdrop of relevant market conditions in the industry. The importance of market-specific circumstances in drawing inferences about conspiracy from observed bidding patterns is emphasized by Porter and Zona, who note:

> In general, finding a single test procedure to detect bid rigging is an impossible goal. As in most tests for the exercise of market power, the idea is to identify differences between the observable implications of collusive and competitive behavior. The difficulty is that both competitive and collusive equilibria depend, to great extent, on the economic environment.

R. Porter and J. Zona, *Detection of Bid Rigging in Procurement Auctions*, 101 J.POL.ECON. 518, at 519 (1993).

Dr. Lanzillotti's opinion is based on the theory that the defendants participated in "Conscious Parallelism"—defined by the Supreme Court in the following manner:

> **Tacit collusion,** sometimes called **oligopolistic price coordination or conscious parallelism,** describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic in-

---

**47.** Seven repackaging plants in Florida versus two in Alabama.

**48.** Allied Universal bids in Florida. It has repackaging plants in southeast Florida, central Florida and Brunswick, Georgia, which serves north Florida.

terests and their interdependence with respect to price and output decisions (emphasis added).

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. ——, ——, 113 S.Ct. 2578, 2591, 125 L.Ed.2d 168, 189 (1993). According to Lanzillotti conscious parallelism is a process by which defendants observe their competitors in the market place and take those observations into account in determining their own actions or responses. As part of the process they might bid on jobs they do not expect to win, as signals to their competitors that on the next bid or so they might raise their prices.

Lanzillotti relies almost entirely on a 1969 academic article written by then associate law professor, now a sitting federal judge on the Seventh Circuit Court of Appeals in Chicago, Honorable Richard A. Posner,[49] in which the author saw no difference between a conspiracy accomplished by tacit, subtle kinds of activities and a conspiracy accomplished by explicit activities. Posner, *Oligopoly Price and the Antitrust Laws: A Suggested Approach*, 21 STAN.L.REV. 1562 (1969). Posner's view, however, was not the law, only a suggested approach from which the law veered when it returned to the "rule of reason" during the last twenty-five years.[50] Even Posner recognized his concept of "tacit collusion" had not been accepted when he said:

> Suppose there is no agreement at all. In a market with three firms of equal market shares, one firm increases price and hopes that the others will understand that all three have a common interest in raising price. Or one firm, in a time of expanding demand, declines to add to capacity; the other two learn of this decision and do likewise. There are no dealings among the firms, but there is an understood mutual interest. Is this a combination in restraint of trade?

The answer given by most courts and scholars is no.

R. Posner & F. Easterbrook, *Antitrust Cases, Economic Notes and Other Materials*, 307 (2d ed. 1981).[51]

In the 1984 supplement to the Posner and Easterbrook text, the authors questioned the premise underlying the 1969 Posner article, pointing to new studies, pertinent portions of which follow:

> These new studies call into question the position—which underlies much of antitrust law, ... that increasing concentration creates a significant rush of cartels (or cartel-like oligopolistic interdependence).

> . . . . .

> These studies, taken together, suggest that we must be very cautious of claims that concentrated markets are not competitive markets. Concentration predisposes to collusion, no doubt, but it may turn out as in *DuPont v. FTC* [729 F.2d 128 (2d Cir.1984)] that three or four substantial rivals are enough to preserve competition even under the "ideal" conditions for collusion.

> . . . . .

> Three economists have questioned whether even inflexible delivered pricing is a symptom of a cartel. ... Carlton points out that there is no reason why members of a cartel would gain from using identical delivered prices. ... Carlton argues that a rational cartel would use f.o.b. pricing, so that each member "naturally" gets the business of the nearest customers, to which freight costs are least, and the member can detect cheating when the pattern of sales changes.

---

**49.** Judge Posner clerked for Justice William Brennan after graduation from Harvard Law School. From there he served on the staff of FTC Commissioner Philip Elman, serving as an assistant to the Solicitor General. As a professor of law at the law schools of Stanford University and the University of Chicago, he helped pioneer the adoption by the courts of many concepts of the so-called "Chicago School." For the past decade he has served on the Seventh Circuit Court of Appeals in Chicago.

**50.** An explanation of the rule of reason appears in the court's discussion of the case law development of antitrust law beginning on page 35 of the opinion.

**51.** Posner was then a professor of law at the University of Chicago, leaning toward the conservative "Chicago School" of economics.

R. Posner & F. Easterbrook, *Antitrust Cases, Economic Notes and Other Materials,* 41–43 (2d ed. Supp.1984).

Posner and Easterbrook, in the section of the supplement entitled "Uncertainty and Antitrust,"[52] went on to say:

> Every market is balanced between competition and cooperation.
>
> . . . . .
>
> If cooperation is at once frequently beneficial and frequently ill-understood, it makes little sense to have a tradition of hostility [toward business practices which may involve some tacit cooperation among competitors]. We should not leap from ignorance to condemnation.

*Id,* at 44–45.

Judge Posner's view of "conscious parallelism" or "tacit collusion" has changed since he authored the 1969 article. In explaining the changes in his philosophy through the years, Judge Posner revealed he has replaced his former acceptance of the oligopoly theory of economics espoused by Joe Bains and Edward Chamberlain with new theories and new studies concerning market concentration. R. Posner, *From Von's to Schwinn to the Chicago School: Interview with Judge Richard Posner, Seventh Circuit Court of Appeals,* ANTITRUST, Spring 1992, at 4.

▄▄▄ The Supreme Court and the Eleventh Circuit have set the standard for establishing an antitrust conspiracy. A plaintiff must have evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Dunnivant v. Bi–State Auto Parts,* 851 F.2d 1575, 1580 (11th Cir.1988). In a case based on conscious parallelism (or parallel behavior), a plaintiff must have 1) significant probative evidence supporting the theory of conscious parallelism, 2) some "plus" factor that tends to indicate the absence of independent action, and 3) a showing that the defendants' behaviors were contrary to their own economic self-interest so as to raise an issue of good faith business judgment.

In relying on the *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) requirements (reliability and relevancy), defendants claim Dr. Lanzillotti's testimony is inadmissible for three reasons: 1) his testimony is inconsistent with antitrust law from the United States Supreme Court and the Eleventh Circuit and thus is irrelevant; 2) his subjective interpretation of normal business communications and events as being conspiratorial is irrelevant and has no reliable basis in his discipline, economics; and 3) his subjective judgment that defendants conspired and that each defendant was a conspirator cannot be tested and thus had no reliable basis in economics.

▄▄▄ Dr. Lanzillotti's opinions are incompatible with antitrust law in two areas: 1) his opinion that a *unilateral* decision by a supplier to do or not to do something could be conspiratorial; and 2) his opinion that conscious parallelism (or tacit collusion) *is* conspiratorial. Dr. Lanzillotti testified a unilateral decision, such as not attempting to increase market share, could be tacit collusion—a conspiracy violating the Sherman Act. He failed to grasp the concept that unilateral decisions are by definition independent actions and thus not antitrust violations. Dr. Lanzillotti's opinion that there was an antitrust conspiracy conflicts with opinions issued by the Supreme Court and the Eleventh Circuit.

To reach the conclusion that conscious parallelism is conspiratorial, Dr. Lanzillotti ignored the "plus" factors indicating independent action on the part of the defendants and the fact that participation in a conspiracy would have been contrary to their economic self-interests. As subjective beliefs, his interpretive opinions have not and cannot be tested, have not been subjected to peer publication, cannot have a known or potential rate of error, do not have general acceptance in economics, and have not been generally accepted.[53] Therefore, they are not reliable under *Daubert.* His subjective interpretation of normal business communications and events as being conspiratorial is irrelevant

---

**52.** Adapted from Frank H. Easterbrook, *The Limits of Antitrust,* 63 TEX.L.REV. 1 (1984).

**53.** *Daubert* factors to be considered in a Fed. R.Evid. 104(a) inquiry.

and has no reliable basis in his discipline, economics.

Furthermore, Dr. Lanzillotti's expert testimony is contradictory. As an economic expert for the Florida Attorney General in the Florida "panhandle" case, he defined the collusive market as being composed of the southern portions of Alabama, Mississippi and Louisiana plus the Florida panhandle. Northern Alabama, Georgia, the Carolinas, Virginia, West Virginia, Tennessee and Kentucky were not included in his defined market area. Although Dr. Lanzillotti advised the Florida Attorney General that there was a conspiracy in the peninsula of Florida, he now says the peninsula area is conspiracy-free.

From his observation of the charts and data compiled by statistician McClave on Lanzillotti's selected market area, Dr. Lanzillotti noticed that the resale price of packaged chlorine rose faster than the increase in the chlorine repackagers' cost of raw chlorine—hinting at a suggestion of conspiracy. In reaching this conclusion, however, he not only failed to evaluate the defendants' total cost of conducting business, he stated during deposition testimony that "no matter how significant other costs were to raw costs" his opinion would not change.

Dr. Lanzillotti's observation based on incumbency data—the frequency with which incumbents won each year's new chlorine supply contract—is limited to chlorine transactions of municipalities that solicit competitive bids.[54] It ignores sales to commercial and industrial businesses and sales to municipalities that negotiate prices. Out of the hundreds of municipalities, water boards, sewer boards, and other entities, only 10 to 15 use the publicly opened sealed bid for the purchase of chlorine. Dr. Lanzillotti's use of one point to represent the percentage of incumbent wins for each year actually depicts, at most, five to eight sealed bid situations on the South Alabama charts and about the same number on the North Alabama charts. A change of one bid out of five could result in a 20 percent swing in the percent-ages. Consequently, data based on so few transactions is statistically meaningless.

Although Dr. Lanzillotti assumed the incumbent was the low bidder and got the contract in each instance by some tacit collusion, he admitted municipalities often have preferences for certain suppliers and find ways to award contracts to them, as in the case of Albertville. Even so, there was no pattern of incumbents winning the bid of the Birmingham Water Works Board or Huntsville, two of the three largest purchasers of chlorine in the subject area. In situations in which Dr. Lanzillotti said systems flipped coins to decide tie bids, chance outcomes greatly affect incumbency rates when taken from limited data sources.

Incongruously Dr. Lanzillotti sees something sinister in what he terms "stable market shares" of the defendants. The figures, however, show anything but stable market shares. Rather than indicating collusion, the figures evidence absence of collusion, contradicting the existence of a conspiracy. Industrial's market showed wide increases and decreases—from virtually no market share in 1981 to 21 percent by 1985 and 42 percent by 1989. Jones' market share decreased every single year of the alleged conspiracy, declining from a 31 percent market share to a 16 percent market share. Harcros's market share plummeted from 41 percent to 25 percent between 1987 and 1988. PB & S's seven percent 1983 market share dropped off the bottom of the chart by 1986, with PB & S not even making it back onto the chart until 1992. Even so, Dr. Lanzillotti took the position that losing market shares every year could be indicative of a conspiracy.

The ups and downs of other companies indicated no pattern. Van Waters had less than one percent to zero market share in Alabama in 1984, 1985, 1986, and 1987. In the "North Alabama" submarket it won only the Gadsden bid in 1988, 1989, and 1990. Significantly, plaintiffs' statistician Dr. McClave conceded this series of bids did not indicate a collusive bid pattern. In the "South Alabama" submarket served by Van Waters' Mobile branch from 1982 through

---

54. Dr. Lanzillotti proceeded on the erroneous assumption that "the publicly opened sealed bid

... [was] the predominate sales mechanism used by public purchasers."

1992, Van Waters never won a bid.[55] Participation in a conspiracy in which it won virtually no bids and had a "zero market share" would have been economically irrational behavior for Van Waters. The same would have been true for PB & S which also had "zero market share."

Dr. McClave's market share charts for the North Alabama and South Alabama "submarkets" show drastic changes in market shares. Van Waters moved from a 65 percent market share of the North Alabama market in 1982 to zero in 1986. Harcros's share of the same market fluctuated from 29 percent in 1983, to 62 percent in 1984. Its 67 percent market share in 1987 was down to 24 percent in 1989. Industrial's share showed similar fluctuations: one percent in 1984; 33 percent in 1985; 34 percent in 1987; one percent in 1988; and back to 62 percent in 1989.

McClave's South Alabama chart shows unstable market shares as well. Harcros suffered continual decreases in market share over the time of the alleged conspiracy. Former defendant Mayo went from a zero percent of the market share in 1983 to 15 percent by 1985.

Although both Lanzillotti and McClave admit one would expect to find stable market shares if a conspiracy were in effect, they still opine defendants' fluctuating market shares evidence collusion. McClave states PB & S's zero percent market share over several years is a "stable number." With no supporting evidence, plaintiffs' experts conclude PB & S and Van Waters conspired to sell no chlorine in Alabama because they picked up chlorine sales in other areas. Lanzillotti and McClave both testified, however, there would have to be evidence of a makeup market's being given in some other Southeastern state. There was no evidence of

increased markets elsewhere. In fact McClave testified he had no evidence PB & S had been given a disproportionate increase in market share in other parts of the Southeastern states to counterbalance or compensate it for conspiring to put itself out of business in Alabama or to go from an 18 percent market share in 1983 to a zero market share. As manager of quality assurance at PB & S Mr. Richard Perry[56] was and is responsible for selling prices on compressed gases: chlorine; anhydrous ammonia; and sulphur dioxide. His undisputed testimony is as follows:

1) He never had bidding or price information, direct or indirect from competitors prior to bids.

2) PB & S never considered Alabama a significant market area for the retail sale of chlorine.

3) Municipal bid purchases of chlorine have been only a tiny portion of the PB & S business in North Alabama, which has consisted primarily of industrial accounts.

4) PB & S was never afforded any other territory to compensate for a diminished share of the Alabama market.

### B. *McClave*

Dr. McClave's report summarized the results of statistical and econometric analyses performed under his supervision in the State of Alabama and other Southeastern states by Info Tech, Inc., but he adopted Dr. Lanzillotti's definition of the relevant markets and submarkets rather than defining them himself. All of McClave's analyses focused "on the sale of repackaged liquid chlorine to public entities in the Southeastern market, and most of [his] analyses focus[ed] on the geographic sub-marketing of Alabama and Florida panhandle municipalities that let bids on an annual basis."[57] McClave Report, p. 3.

---

55. The chlorine sold by Van Waters in the "South Alabama" submarket is trucked from Geismar, Louisiana, or Tampa, Florida. Consequently it has had a substantial cost disadvantage in relation to other chlorine suppliers who sell chlorine in the *Mobile* area. Van Waters' practice was always to bid list price, the same price charged to non-bid customers for chlorine, on contracts to supply municipal entities in South Alabama.

56. Mr. Perry has been employed by PB & S since 1975.

57. The municipalities of the Florida panhandle are not parties to this suit. The suit alleges a conspiracy in the state of Alabama—not Alabama, the Florida panhandle, and the Southeastern states.

McClave's methodology to determine the existence of a conspiracy is his subjective judgment. His subjective judgments, however, cannot be tested. His opinions about whether high losing bids are signals is based on looking at the data using his "experience" and "judgment." He admits there is no statistical test to determine that a high losing bid is a signal. His statistical analysis is not impressive. Having testified, McClave has not made a case under Fed.R.Evid. 104. His statistics show anything but a successful conspiracy.

Although Dr. McClave testified he knew of "no way to put measures of error on anybody's judgment" other than by looking "at the rate of error associated with similar judgements in the past," Mr. Justice Blackmun in speaking for the Supreme Court stated:

> Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Green, at 645. See also C. Hempel, Philosophy of Natural Science 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability").

*Daubert*, ––– U.S. at –––– – ––––, 113 S.Ct. at 1796–1797, 125 L.Ed.2d at 482–483.

Additionally, Dr. McClave's mistaken belief that conscious parallelism is a conspiratorial agreement is inconsistent with antitrust law as declared by the Supreme Court and the Eleventh Circuit. He apparently does not understand that the law requires excluding the possibility of independent action by the alleged conspirators before even considering other elements of a conspiracy.

Dr. McClave created new data from the sparse data furnished him: tie bids, incumbency and "market"[58] shares—all three correlated. He determined there was a tendency for tie bids to be awarded to the incumbent company; conceded that if there were some explanation other than collusion for the incumbents winning tie bids that the explanation would reach to their winning and to the market shares; and determined that tie bids, incumbents winning and market shares are not independent events.

Even so, Dr. McClave admits that tie bids will be seen in competitive markets. His tie bid analysis includes bids by nondefendants who tied with defendants. Such evidence does not support an inference that defendants conspired, but others did not. He opined that tie bids between Industrial and Jones, and Industrial and PB & S, were indicative of explicit agreements because of their distributor/supplier relationships.

Of the seventeen different companies that bid for chlorine contracts in Alabama during the alleged conspiracy, five bids were won by companies not identified by McClave as conspirators. Failure to consider this dilutes his analysis.

Rather than being evidence of a conspiracy, the evidence of tie bids in this case should be viewed as a strong indication of the absence of a conspiracy.

Dr. McClave argues defendants are earning supracompetitive prices. The graphs of C.P.A. Garner[59] show Industrial's gross profits went up as the alleged conspiracy ended. For ton containers, Industrial's gross profits ranged between 17 and 19 percent for 1985, 1986, 1987, and 1989, and increased to 28 percent in 1990. By 1991 gross profits per ton of chlorine had increased to 43 percent. Gross profits for 150 pound containers ranged between 38 and 47 percent for 1985, 1986, 1987, 1988 and 1989.

**58.** Dr. McClave calls his statistics "market" shares, but admits that his numbers only include that portion of the market in which the plaintiffs buy chlorine by sealed bids.

**59.** Mr. Garner's analysis appears to have been ignored by Dr. Lanzillotti.

Profits increased to 56 percent in 1990 and were up to 63 percent in 1991.

## C. *Kasserman*

Dr. David L. Kasserman,[60] expert for Harcros, PB & S and Van Waters, flaws the Lanzillotti/McClave analysis for failure to consider expected raw cost increases and opportunity costs. He analyzed the same structural conditions that Dr. Lanzillotti analyzed and other structural conditions Dr. Lanzillotti ignored (those that contradict the existence of a bid-rigging conspiracy in the Alabama repackaged chlorine market). Dr. Kasserman also examined the pricing and bidding patterns that Dr. McClave believes are consistent only with conspiracy. He provides lawful, noncollusive explanations for them. Upon completion of his analysis, Dr. Kasserman has opined bid rigging did not occur in the Alabama repackaged chlorine market as alleged by the plaintiffs. In the case of Van Waters, failure to consider raw cost increases and opportunity costs, coupled with transportation costs, results in a major flaw. Van Waters' chlorine bids, particularly from its Mobile branch, were at, near, and sometimes below cost. Even Dr. McClave acknowledged Van Waters' representative bids of the Mobile branch were not noncompetitive.

Dr. Lanzillotti failed to consider the role of supply and demand in pricing. He did admit that during the decade of the 80's the chlorine market moved from one with oversupply of chlorine with low demand to one with increased demand. The period of increased demand coincided with the proportionately greater increase in the price of repackaged chlorine. Dr. Lanzillotti, nevertheless, found the combination of increased price and increased demand to be suggestive of "tacit collusion." He further failed to figure built-in margins to cover anticipated future cost increases, but acknowledged that a hedge of some type might be something one would want to do.[61]

In reaching the conclusion that a conspiracy occurred, Dr. Lanzillotti ignored barriers to entry in the market—a widely recognized determinant in collusive agreements. Where barriers to entry are low, an increasing price caused by the formation of a successful collusive agreement among producers will attract new firms in the market. With the addition of new suppliers the price will be pushed back down. Thus, according to Dr. Kasserman, collusion is unlikely to occur in markets where barriers to entry are low and particularly where low barriers are combined with inelastic demand.[62]

Dr. Kasserman determined the repackaged chlorine industry is characterized by very low entry barriers. There are no prohibitive patents or secret production technologies to prevent new companies from producing repackaged chlorine—a relatively simple manufacturing process. There are no problems with access to raw materials. There are no pronounced economies of scale that require a large-scale operation to be cost competitive. There is no significant product differentiation to be overcome by new entrants. Consequently, had there been a conspiracy in the market, new entry into the repackaged chlorine market would have been expected. Such was not the case. The number of chlorine repackagers in Alabama and Tennessee did not change during the period of 1984 through 1990. The states of Georgia, Florida, South Carolina, and North Carolina each lost a repackager, resulting in a net loss of four repackagers in the Southeastern repackaged chlorine market.

Dr. Lanzillotti further ignored the organizational structure of the firms involved in the alleged conspiracy. Dr. Kasserman consid-

**60.** B.S., economics, the University of Tennessee. Ph.D., economics, The University of Florida. Torchmark Professor of Economics, Auburn University, 1988–present. Dr. Kasserman taught economics at the University of Tennessee, the University of Florida, and Auburn University prior to moving into his present position from that of professor and Head of Economics at Auburn University. He has published extensively in his field and has presented papers at numerous pro-

fessional meetings. He has testified before state and federal agencies and in judicial settings.

**61.** Repackagers purchase raw chlorine at fluctuating, non-firm prices and sell it at firm prices generally guaranteed for a year.

**62.** A decrease in price will not lead to a comparable increase in consumption.

ered this factor of utmost importance. Plaintiffs have failed to provide any personal incentive for any of the people involved to risk the consequences of participating in a conspiracy. Absent personal incentives plaintiffs have failed to give any plausible reason why defendant employees would participate in a bid rigging conspiracy, risking imprisonment and imposition of millions of dollars of liability on their employers.

Dr. Lanzillotti's statement that central pricing control of chemicals other than chlorine did not exist is contradicted by record evidence regarding Van Waters. Mr. Simpson testified that an "edict issued by the president" of McKesson required all regional managers to approve all below-schedule (below list) pricing on all products in their regions from 1984 through 1987 or 1988. Mr. Ezell testified he never consulted Mr. Simpson regarding bid prices for bids submitted by the Mobile McKesson/Van Waters branch.

## D. *Blair*

Dr. Roger Blair [63] was offered as the expert witness for Jones. His report is expressly limited to a critique of the reports of Drs. Lanzillotti and McClave.[64] Based upon current, accepted economic doctrine, Dr. Blair opined that the market conditions and bidding patterns upon which Drs. Lanzillotti and McClave based their opinions are ambiguous and insufficient to prove an illegal agreement under Section 1 of the Sherman Act.

## E. *Under Daubert*

In determining whether the theory used by Drs. McClave and Lanzillotti has been tested,[65] the court has noted that neither expert has identified conspirators or the existence of a conspiracy in court on direct examination. Dr. Lanzillotti is unable to remember whether he has been permitted to testify as to the identity of conspirators in a conspiracy to fix prices and allocate markets. Dr. McClave, however, has identified conspirators and the existence of a conspiracy on redirect examination in one antitrust case after a defense lawyer opened the door.

Since it is impossible to test the reliability of Drs. McClave and Lanzillotti by the above standard of their conclusions having been tested, the court has moved to the second standard: subjection to peer review and publication. When questioned on the acceptance by the scientific community of the process by which he determined the collusive markets and participants therein, Dr. Lanzillotti referred to the 1969 article by Judge Posner,[66] previously mentioned, as support for his analysis in the case at bar. As previously noted, Judge Posner's advocacy of tacit collusion in the article was a suggested approach, not the law, and a position he later rejected.

Dr. McClave cited a publication by Dr. Kasserman in which Kasserman mentioned Dr. McClave's work in another case using the same methodology as used in the instant case as a validation of his method. The Kasserman reference, however, dealt with methodology of estimating damages, not identifying conspirators in a collusive market.

As a factor in determining reliability the Supreme Court spoke of publication in the following manner:

> The fact of publication (or lack thereof) in a peer-reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

McClave's qualifications as a statistician, nor does he challenge Dr. Lanzillotti's qualifications as an economist. He does, however, disagree with their conclusions in the case at bar.

---

**63.** Dr. Blair was engaged by Jones to provide an analysis of the expert reports submitted by Dr. Robert F. Lanzillotti and Dr. James T. McClave. Dr. Blair opined they had examined ambiguous evidence. In his view the evidence they cite is "equally consistent with oligopolistic rivalry and a complete absence of collusion."

Drs. Blair and Kasserman have written a book together entitled *Antitrust Economics*.

**64.** Dr. Blair has co-authored two articles with Dr. McClave. He does not challenge Dr.

**65.** The first *Daubert* factor. See pages 1512–1513.

**66.** Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 STAN.L.REV. 1562 (1969).

*Daubert,* ―― U.S. at ――, 113 S.Ct. at 2797, 125 L.Ed.2d at 483.

Dr. McClave testified he knew of no way to measure the rate of error [67] on possibility or potential for error on anyone's judgment other than by looking at the rate of error associated with similar judgments in the past. He did not know how his methodology had been used by others. Similarly, Dr. Lanzillotti was unable to give a formula for the rate of error.

The methodology used by Drs. McClave and Lanzillotti failed the fourth *Daubert* factor, as well. There is no acceptance of their methodology in the relevant scientific community. The rejection of Posner's conscious parallelism, however, is widespread.

## VII. McCLAVE TESTIMONY STRICKEN

 Having testified, McClave has not made a case under Rule 104. His testimony is stricken because it is not reliable. His statistical analysis is not impressive. McClave's statistics show anything but a successful conspiracy. Under Fed.R.Evid. 104 his testimony is rejected as expert testimony.

## VIII. GARNER TESTIMONY STRICKEN

 The "expert" testimony of Mr. Perry Garner, C.P.A., is also inadmissible. He is no more qualified than Dr. McClave to testify on opinions based on economic theory. His deposition testimony regarding Van Waters' actual profit margins shows only that he did not consider a number of important cost factors. Significantly, exhibits produced by Mr. Garner have all been produced since his deposition at which time he expressed no opinions concerning the possibility of the existence of or the members of any antitrust conspiracy.

67. Third *Daubert* factor.

68. Dismissed as a defendant.

69. Dr. Thompson is an Emeritus Professor of the College of Commerce and Business Administration of the University of Alabama where he taught economics and business administration from 1967 until retirement. He has authored economics and business administration textbooks

## IX. SUMMARY JUDGMENT— CONSPIRACY COUNT

 This court, following the law as set by the Supreme Court and our circuit in *Helicopter,* 818 F.2d 1530 (11th Cir.1987), and *Dunnivant,* 851 F.2d 1575 (11th Cir. 1988), holds that the defendants are entitled to summary judgment as a matter of law. Plaintiffs have failed to satisfy the court the alleged conspiracy was economically reasonable and have failed to present evidence excluding the possibility of independent action on the part of defendants. Not only is the above necessary evidence lacking, the Supreme Court has recognized that a conspiracy cannot work if one significant competitor does not participate. *Brooke Group,* 509 U.S. at ――, 113 S.Ct. at 2569, 125 L.Ed.2d at 196–97 (quoting 2 Areeda and Turner ¶ 404b2, at 276). Dr. Lanzillotti opined that Allied, a repackager operating out of Brunswick, Georgia, was a competitor, but not a conspirator. In his opinion Mayo,[68] a repackager operating out of Chattanooga, Tennessee, was at times a conspirator and at times not. Lanzillotti does not know if Apperson, a chlorine reseller like Industrial, was a conspirator. Of note is the fact that in some years Apperson's share of sales to plaintiffs in Southern Alabama was higher than Industrial's and was twice as high as Industrial's sales in 1987.

### A. *Industrial*

Industrial has shown the court it had no motive to conspire to control the chlorine market. Data furnished to plaintiffs relative to its chlorine sales was not provided in turn to plaintiffs' experts. A comparison of prices charged other customers shows Industrial was not a member of a conspiracy. Dr. Arthur A. Thompson, Jr.[69] analyzed Industri-

and has served as a consultant in related fields. He earned a Ph.D. in economics from the University of Tennessee and has since studied at the Harvard Business School as a visiting scholar and as a participant in its individual studies program.

Dr. Thompson reviewed the reports prepared by Dr. Lanzillotti and Dr. McClave on behalf of the plaintiffs and by Dr. Blair, Dr. Kasserman

al's sales in four categories of customers: (1) Plaintiffs that bid; (2) Plaintiffs that did not bid; (3) Other government entities; and (4) Nongovernment entities. From his analysis he drew the following conclusion:

> The fact that Industrial Chemicals charged the plaintiffs consistently lower prices for chlorine bought in either 150–lb. cylinders or in tons is powerful evidence that the analysis and opinions of plaintiffs' experts are badly flawed and erroneous. It makes no sense for Industrial Chemicals to have conspired with other chlorine sellers, as alleged by plaintiffs' experts, to rig their bids in a manner which resulted in lower prices being charged to the plaintiffs than other customers. The **purpose of a conspiracy is to charge a higher price, not a lower price.** The opinions of plaintiffs' experts that the pricing patterns they observed represent bid rigging are simply not credible insofar as Industrial Chemicals is concerned.
>
> I also examined what proportions of Industrial Chemicals' total sales were represented by chlorine sales (all customers) and chlorine sales to plaintiffs.
>
> . . . . .
>
> These statistics indicate that Industrial Chemicals' total sales of chlorine to all customers amount to only 4–5% of its total business. Industrial Chemicals' sales of chlorine to the plaintiffs amount to only 1% of total sales and to only about 20% of total chlorine sales. Given that chlorine sales to the plaintiffs are such a tiny part of Industrial Chemicals' total business, it is hard to see any good business reason or motivation to engage in conspiratorial behavior. Plaintiffs' experts have apparently overlooked this in their attempt to link Industrial Chemicals to their alleged conspiracy theory.

Preliminary Report of Arthur A. Thompson in Alabama Chlorine Antitrust Litigation, July 1994, pp. 8–9 (emphasis added). *See also* VI P. Areeda *Antitrust Law,* ¶ 1429, at

175–178 (1986) (The economic theory present in an oligopoly states that each firm, without agreement, will seek to maintain its market share at the highest possible price).

■ Plaintiffs' assertion that if the market were truly competitive individual defendants would cut prices in order to increase market share is not consistent with economic theory. In an oligopoly each seller's price affects the market price to be expected on the next sale. The incentive to reduce prices is restricted because any price cut would immediately become public knowledge on the bid opening, resulting in the lowering of prices by other firms on following bids in an effort to maintain their share of the market. *See generally,* VI P. Areeda *Antitrust Law,* ¶ 1429c., at 177–178 (1986); Turner,[70] *The Definition of Agreement Under the Sherman Act: "Conscious Parallelism and Refusals to Deal,"* 75 HARV.L.REV. 655, 659 (1962) ("[T]he fact that competitors have knowingly charged identical prices is a neutral fact in the absence of evidence which would lead one to expect that the prices would have been different if truly independent decisions had been made.")[71] Even Dr. McClave admits the economic data he compiled cannot exclude the possibility of independent decisions by defendants.

■ Additionally, Dr. Lanzillotti's data pertaining to Industrial is inaccurate. It does not include data on the rest of Industrial's more than 300 yearly chlorine customers. The data and Lanzillotti's accompanying analysis are limited to the one to two percent of Industrial's customers that solicited sealed bids. Because all of Industrial's customers are not considered, experts' opinions relating to its part in a conspiracy are unreliable. In *Brooke Group,* 509 U.S. at ——, 113 S.Ct. at 2598, 125 L.Ed.2d at 198, the Court stated:

> When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the

and Mr. Clinton on behalf of the other defendants.

**70.** Donald F. Turner, Professor of Law, Harvard Law School. A.B., Northwestern, 1941; Ph.D. Harvard 1947; L.L.B., Yale, 1950.

**71.** Significantly, this is one of the few areas in antitrust theory in which the Harvard and Chicago schools of thought agree.

opinion unreasonable, it cannot support a jury verdict. ... Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them. As we observed in Matsushita, "expert opinion evidence ... has little probative value in comparison with the economic factors" that may dictate a particular conclusion.

Plaintiffs contend defendants conspired by bidding at list price on sealed bids. Although Dr. Lanzillotti contends nonbid customers paid list price, as well, the evidence indicates chlorine prices charged to Industrial's customers varied greatly. The fact that parallel bids have occurred in the context of sealed bids does not change the analysis. Bid openings occur weekly from the hundreds of sealed chlorine bids in the Southeastern United States let each year. The bid results, announced at the openings, and bid tabulations setting out the bids of all vendors are usually mailed to all bidders. Thus, the current bids of all bidders are readily available public information published by the municipal entities.

■ Accordingly, identical bid results are not evidence of a conspiracy:

> Especially where the bids ultimately become public,[72] such parallelism need not show anything more than a reluctance among the rivals to cut market prices that will be readily matched on the next transaction, which will occur immediately. In such circumstances, the parallelism of closed bids is nothing more than the parallelism of market prices. Interdependence may well be present, as in all oligopoly pricing, ... but no traditional conspiracy may be inferred (footnote omitted).

VI P. Areeda *Antitrust Law,* ¶ 1420a., at 119 (1986).

From calculations of Industrial's total chlorine sales to all customers and the proportion of sales made to plaintiffs, Dr. Thompson reached the following conclusion, recited by deposition testimony:

> These statistics indicate that Industrial Chemicals' total sales of chlorine to all

customers amount to only 4–7% of its total business. Industrial Chemicals' sales of chlorine to the plaintiffs amount to only about 1% of total sales and to only about 20% of total chlorine sales. Given that chlorine sales to the plaintiffs are such a tiny part of Industrial Chemicals' total business, it is hard to see any good business reason or motivation to engage in conspiratorial behavior. Plaintiffs' experts have apparently overlooked this in their attempt to link Industrial Chemicals to their alleged conspiracy theory.

Dr. Thompson found that the mean price Industrial charged for both 150–pound cylinders and tons of chlorine was consistently below the prices Industrial charged other governmental and nongovernmental entities throughout the time period studied. The mean prices charged on plaintiffs' purchases involving competitive bids were consistently lower than the mean prices charged for the other three buyer classifications (purchases by nongovernment entities, purchases by governmental entities other than plaintiffs, purchases by plaintiffs believed to have been made on the basis of price quotes rather than bids). "The plaintiffs' data base contains only a small sample of the prices Industrial Chemicals charged its chlorine customers. Plaintiffs' attempts to draw conclusions about Industrial Chemicals' pricing using such a limited number of price observations are unreliable and incapable of yielding trustworthy conclusions." The fact that Industrial Chemicals charged the plaintiffs consistently lower prices for chlorine bought in either 150–lb. cylinders or in tons is powerful evidence that the analysis and opinions of plaintiffs' experts are badly flawed and erroneous.

The court holds that Industrial is due summary judgment for the following reasons:

1) Industrial's chlorine sales data shows that Industrial did not participate in the alleged conspiracy as set out by Dr. Lanzillotti;

2) Industrial chlorine sales data shows that it is implausible that Industrial participated in any conspiracy;

---

**72.** Even if the bids remain secret, losing firms will suspect that the successful firm under-bid

the usual market price and react accordingly.

3) Dr. Lanzillotti's opinion of Industrial's participation in an antitrust conspiracy based on only two pieces of economic data is implausible; and

4) Plaintiff's other evidence against Industrial is both inadmissible and ambiguous.

### B. *Jones and Van Waters*

Jones joined in Industrial's motion for summary judgment, adopting and incorporating all material submitted by Industrial. Van Waters adopted the motions for summary judgment and briefs submitted by Industrial and Jones. The court holds that Jones and Van Waters are due summary judgment as a matter of law. Industrial and Van Waters are clearly out. The others do not have that much economic power to make a conspiracy stick.

The court has not felt it necessary to address Jones's motion in the alternative for partial summary judgment based on the Sherman Act's four year statute of limitations.

### C. *PB & S*

 Not only is there no supporting evidence that PB & S was part of a conspiracy to fix prices, PB & S produced evidence that it was a nonplayer in the "South Alabama" submarket, as defined by plaintiffs, and had only a handful of sales in the North Alabama market. PB & S had no business in South Alabama and the Florida Panhandle area, and won only three bids in North Alabama from 1984–1990. It had a nonexistent market share from 1985 to 1990, the period of the purported conspiracy. PB & S was not a player in sales to municipalities. Plaintiffs have produced no evidence that PB & S was motivated to, participated in, or benefited from a conspiracy.

It is more economically plausible to accuse other nonparties to this case of being conspirators than to accuse PB & S. Mayo Chemical's share of the North Alabama market went from 8.42 percent in 1986 to 31.51 percent in 1988. It is more economically plausible that Apperson Chemical Company

was a conspirator than PB & S. It had a large market share in the Alabama and Florida Panhandle during parts of the conspiratorial period. PB & S had none. Van Waters had none. PB & S never sold chlorine in the Florida Panhandle area, only in the Florida Peninsula where plaintiffs' experts concluded there was no conspiracy.

Plaintiffs have failed to carry their burden of proof that PB & S was engaged in a conspiracy. Additionally they have failed to carry their burden of proof that PB & S engaged in price fixing. The affidavit of Richard Perry, manager of quality assurance at PB & S, is undisputed.

Plaintiffs have cited a memorandum from Mr. Perry to his Orlando, Florida, manager concerning pricing as "signaling" to raise market prices in the Florida Peninsula. Orlando, however, is in the Florida Peninsula market area, an area in which plaintiffs' experts have testified, in this case, there was no conspiracy to fix prices. This memorandum proves nothing.

While it is true PB & S sold chlorine to its distributor Industrial in the North Alabama [73] territory, there is no evidence PB & S had control over Industrial's resale price. According to Mr. Perry PB & S was unaware of the prices Industrial charged for chlorine.

For the above cited reasons PB & S's motion for summary judgment is granted.

### D. *Harcros*

 As the only remaining defendant, Harcros would have been unable to conspire by itself. For that reason, plus the fact that plaintiffs have failed to prove Harcros was part of a conspiracy, the court holds Harcros is due summary judgment as a matter of law.

### X. SUMMARY JUDGMENT— FRAUD COUNT

Even were there a conspiracy, plaintiffs have established no basis for the claimed common law fraud count. They allege defendants took the following actions: 1) a series of fraudulent increase letters to chlorine customers; 2) the submission of fraudulent non-

---

**73.** Jones sold chlorine to Industrial in South Alabama.

collusion affidavits with sealed bids; 3) the destruction of documents by Jones; and 4) the defendants' vehement denials of price fixing in the Florida case.

Plaintiffs argue the defendants perpetrated fraud on plaintiffs by wording of announced price increases. Examples of notification of prices increases follow:

WE ALWAYS REGRET ANY INCREASED COST TO OUR CUSTOMERS AND WE WISH TO ASSURE YOU THE ABOVE CHANGES HAVE BEEN THE RESULT OF INCREASES IN THE BASIC COST OF THE PRODUCT OR FREIGHT AND HANDLING CHARGES.

August 11, 1986, notification letter from Cheri McKechnie, PB & S Sales Representative of price increase effective September 1, 1986. Exact wording reappeared in September 9, 1987, PB & S notification letter of price increase effective October 1, 1987, signed by Ms. McKechnie.

Be assured there will not be an increase to you, unless we have an increase from our supplier.

May 24, 1990, communication from Naomi Hartman, PB & S Customer Sales & Service Representative to Mr. Roy Alford of The Town of Centre.

An unprecedented situation has developed in the past twelve months in the Chlor–Alkali industry. We have had four increases in Chlorine Cost.

We have absorbed part of these previous increases, but with this newer increase, we must drastically increase our prices on Chlorine in order to maintain our standards of service and safety.

April 28, 1984, Harcros form letter addressed to "Dear Valued Chlorine Customer."

As you are probably already aware, an unprecedented situation has developed in the Chlor–Alkali industry in recent months. Our cost of chlorine has advanced several times but the most recent price increase effective April 1, 1984, which we have absorbed, makes the following price revision necessary to maintain our standards of service to our loyal customers.

Chlorine is still in a relatively tight supply situation and we anticipate that it will remain so throughout 1984. We want to assure you that Thompson–Hayward Chemical Company will continue to make every effort possible to stabilize prices and protect the needs of our valued chlorine customers.

May 2, 1984, Harcros form letter.

Due to an increase from our manufacturers, we regret, we find it necessary to revise our selling price on Ton Cylinders of Chlorine. This increase will become effective November 1, 1987.

October 28, 1987, Harcros letter from Ted J. McGowan, Industrial Sales Representative, addressed "To our customers."

During the past several months, the Chlorine market has incurred several price increases. We have not passed any of the increases on to our long supportive customers, but unfortunately, we are no longer able to continue.

December 8, 1987, Harcros form letter signed by Tom Howard, Chemical Sales Representative.

Although it in no way reflects the wishes of Jones Chemicals, we find it necessary to adjust our selling prices from time to time in order to keep up with the ever increasing cost of staying in business as a reliable source of chemicals.

September 21, 1987, "Price Change Notice" from John D. Skipper, Sales Representative, Jones Chemicals, Inc.

This price increase is the result of manufacturers increases, operating expenses, insurance costs, and environmental expenses.

April 16, 1985, letter from Robert M. Romeis, Vice President Jones, addressed to "Dear Chlorine Customer."

Due to increased costs of handling and because of the hazardous nature of the material, the Chlorine prices have increased to all our customers.

May 13, 1986, Van Waters letter addressed "TO WHOM IT MAY CONCERN."

Due to an increase from our Suppliers on chlorine, your new price will be as follows:

May 15, 1985, Van Waters letter addressed to "Dear Valued Customer." Significantly, however, plaintiffs have not shown Van Waters sent announcements of price increases to any Alabama customer or to any plaintiff. The only two cited Van Waters documents were sent by the Chamblee, Georgia branch to customers in Georgia. Dr. McClave acknowledged that the letters to the Georgia customers truthfully announced prospective raw chlorine price increases in July 1985 and April 1986.

> As a result of increases announced by our suppliers, we will increase our price on chlorine effective July 1, 1986. These increases are a result of several things, some of which are actual chlorine cost, container cost, insurance coverage, and governmental compliance. We regret to have to advise you of this at this time, but we have no alternative.

June 15, 1986 letter from W.L. Welch of Industrial to customers.

Plaintiffs argue that the necessity for price increases as outlined above was designed to and did deceive the plaintiffs into believing that the price increases were the result of coincident cost increases. They argue they were the victims of the price fixing conspiracy. In actuality, resulting prices were the consequence of market forces and competition. Dr. McClave acknowledged that the costs of raw chlorine skyrocketed 363 per cent from $63.40 per ton in April 1983 to $230.02 per ton in September 1984. The cost of raw chlorine remained over 300 per cent of the April 1983 cost through 1988. Additionally, from the standpoint of economics, entry barriers were not high.

 Having ruled there is no conspiracy, the court finds there can be no fraud for failure to disclose it. The defendants are not obligated to disclose what does not exist. Even were the defendants guilty of conspiracy, they had no confidential relationship with the plaintiffs requiring disclosure of the existence of a conspiracy. In *Lowder Realty, Inc. v. Odom*, 495 So.2d 23, 26 (Ala.1986), brought under Code 1975, § 6–5–102, the

court found no relationship between the plaintiff and defendant sufficient to warrant disclosure when it stated:

> No duty arises from the relationship of the parties here. Lowder and Odom were two independent business enterprises negotiating a business transaction at arm's length. Each party was astute in business matters and was equally capable of protecting its respective interests.

Similarly, in the case at bar the parties negotiated arm's length transactions. *See also, Holdbrooks v. Central Bank of Alabama, N.A.,* 435 So.2d 1250, 1252 (Ala.1983) (quoting 15A C.J.S. *Confidential* (1967), which defined a confidential relationship in the following manner:

> "[A relationship in which] one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another."

The *Holdbrooks* court followed the holding in *Tonsmeire v. Tonsmeire,* 285 Ala. 454, 233 So.2d 465, 468 (1970),[74] by stating: "In the absence of a confidential relationship, we know of no duty imposed by law obligating an alleged tort feasor to make known to one possibly injured by his acts the existence of a possible cause of action."

---

74. The court held in *Tonsmeire* that there was no confidential relationship between antagonistic parties.

During the alleged conspiracy period (1984 to 1990), only 17 of the 39 plaintiffs received bids for chlorine: Mobile, Tuscaloosa, Montgomery, Birmingham, Centre, Dothan, Gulf Shores, Huntsville, Jefferson County, Alexander City, Auburn, Gadsden, Muscle Shoals, Opelika, Sheffield, Talladega and Alberville. Van Waters did not submit a single bid to six: Auburn, Centre, Jefferson County, Muscle Shoals, Opelika, and Sheffield. Accordingly, it made no representations to those six.

Of the 22 plaintiffs that purchased chlorine on purchase orders, Van Waters sold chlorine to only two: Fairhope and Greenville. There is no evidence that Van Waters made any representations to Arab, Baker Hill, Calhoun County, Central Elmore, Dallas County, Geneva, Hayneville, Northeast Morgan County, Jasper, Leeds, Phenix City, Perdido Bay, Prichard, Saraland, Scottsboro, Selma, South Alabama Utilities, Tri–Community, Vernon or Westover. Van Waters is entitled, in any event, to summary judgment on the fraud claims of 26 of the 39 plaintiffs.

Plaintiffs' averments of fraud have not been stated with particularity, as required by Ala.R.Civ.P. 9, nor have they presented substantial evidence of fraud as required by case law. There is no evidence that defendants actively and/or fraudulently concealed any alleged conspiracy. Accordingly, defendants are due summary judgment as a matter of law on the claim for fraud.

## XI. CONCLUSION

The court has found no evidence of a conspiracy among the defendants to restrain trade in the chlorine industry. The court has not found evidence of fraud. In summary, the court holds the following:

1) Industrial is due summary judgment as a matter of law;

2) Jones is due summary judgment as a matter of law;

3) Van Waters is due summary judgment as a matter of law;

4) PB & S is due summary judgment as a matter of law;

5) Harcros is due summary judgment as a matter of law;

6) The testimony of Dr. James T. McClave is stricken;

7) The testimony of Perry Garner is inadmissible;

8) The testimony of Loraine and Peter Casassa is inadmissible;

9) The affidavit of Woody Caine is stricken;

10) The hearsay margin notation about Woody Caine is stricken; and

11) The affidavit of Barbara Krysti is stricken.

An order consistent with this opinion is being entered contemporaneously herewith.

DONE and ORDERED.